1               UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF TENNESSEE
2                   NASHVILLE DIVISION

3

4  UNITED STATES OF AMERICA     )
                          )
5  VS                      )  No. 3:22-mj-4149
                          )
6  JUSTIS JOHNSON          )
  ————————————————————————————————————————

7

8       BEFORE THE HONORABLE JEFFERY S. FRENSLEY,

9                MAGISTRATE JUDGE

10      **TRANSCRIPT OF ELECTRONIC RECORDING**

11          (via video conference)

12            April 20, 2022

13  ————————————————————————————————————————

14  <u>APPEARANCES:</u>

15  For the Government:    MONICA MORRISON
                        U.S. Attorney's Office
16                       719 Church Street, Ste 3300
                        Nashville, TN 37203
17

18  For the Defendant:     LUKE A. EVANS
                        Evans Bulloch & Parker
19                        PO Box 398
                        Murfreesboro, TN 37133
20

21  ————————————————————————————————————————

22  PREPARED FROM **ELECTRONIC RECORDING** BY:

23  **Roxann Harkins, RPR, CRR**
    Official Court Reporter
24  719 Church Street, Ste 2300
    Nashville, TN 37203
25  615.403.8314
    roxann_harkins@tnmd.uscourts.gov

**I N D E X**

Defense witness

**BIANE MCGEE**

Direct Examination By Mr. Evans .....................6
Cross-Examination By Ms. Morrison ..................21
Redirect Examination By Mr. Evans ..................25

Government witness

**TOM EVANS**

Direct Examination By Ms. Morrison .................29
Cross-Examination By Mr. Evans .....................61
Redirect Examination By Ms. Morrison ...............87


**E X H I B I T S**

Government No. 1....Chats from dark web ..........33


Defense No. 1....Character letters ...............14
Defense No. 2....Ms. McGee's third-party ..........16
        custodian declaration

1

2          The above-styled cause came to be heard

3    on April 20, 2022, before the Hon. Jeffery S.

4    Frensley, Magistrate Judge, when the following

5    proceedings were had to-wit:

6              **TRANSCRIPT OF ELECTRONIC RECORDING**

7                          **\*\*\***

8

9          THE COURT:  Good morning, welcome

09:09:56:17    10    everyone.  We're here in the matter of *United States*

11    *of America versus Justis Johnson*.  It's Case

12    No. 3:22-mj-4149 here in this district.  This is an

13    out-of-district matter arising out of the Eastern

14    District of Tennessee.  The case number in that court

09:10:12:27    15    is No. 3:22-cr-32.  Mr. Johnson is present appearing

16    this morning by video conference, along with her

17    attorney, Luke Evans.  And Ms. Morrison's here for the

18    United States.  Mr. Murphy is on for Pretrial

19    Services.

09:10:32:14    20          We had set the matter this morning for a

21    detention hearing.  And before we get started,

22    Mr. Evans, have you had a chance to speak with your

23    client and does she consent to proceed today by video

24    conference?

09:10:46:10    25          MR. EVANS:  Your Honor, I've had an

09:10:47:13    1    opportunity to speak with my client.  She does

               2    consent.

               3                THE COURT:  All right, very good.  Thank

               4    you very much.  Thank you, Ms. Johnson.

09:10:55:15    5                The Court is in receipt of the Pretrial

               6    Services Report, which I've reviewed.  I assume you've

               7    each received a copy of it as well and you-all can

               8    keep your report at the completion of the proceedings

               9    today.

09:11:08:05   10                Ms. Morrison, are there any

              11    announcements?  Is the government ready to go forward

              12    at this time?

              13                MS. MORRISON:  Yes, Your Honor, we are.

              14                THE COURT:  All right, very good.

09:11:15:06   15                Mr. Evans, are you ready to go forward?

              16                MR. EVANS:  Yes, Your Honor.

              17                THE COURT:  All right.  Ms. Morrison,

              18    I'll hear from the government first.

              19                MS. MORRISON:  Your Honor, if the Court's

09:11:24:16   20    so inclined, since the defendant has been indicted, it

              21    would be our position that the presumption operates

              22    and at this point it's incumbent upon the defendant to

              23    rebut the presumption.

              24                THE COURT:  All right, very good.

09:11:36:00   25    Mr. Evans, I'll let you put on whatever proof you

09:11:40:07    1   want.

               2            MR. EVANS:  Yes, Your Honor.  As

               3   previously noticed in our email to opposing counsel

               4   and to the Court, I'll be calling Ms. Biane McGee as

09:11:49:22    5   the defense's witness.

               6            THE COURT:  All right.

               7            MR. EVANS:  And with the Court's

               8   indulgence, I only have access to the one computer

               9   with camera, so I'll be off camera while Ms. McGee

09:12:07:17   10   testifies, if that's okay with the Court.

              11            THE COURT:  Certainly, Mr. Evans, that's

              12   fine.  Ms. McGee, let me go ahead and swear you.  If

              13   you'd raise your right hand, please.

              14                      **BIANE MCGEE**

09:13:46:15   15   called as a witness, after having been first duly

              16   sworn, testified as follows:

              17            THE COURT:  All right, very good.  You

              18   can put your hand down.  Would you please state and

              19   spell your name for the record.

09:13:55:29   20            THE WITNESS:  Yes.  It's Biane McGee,

              21   B-i-a-n-e, M-c-g-e-e.

              22            THE COURT:  All right, very good.

              23   Mr. Evans, you may ask.

              24            MR. EVANS:  Thank you, Your Honor.

              25

**DIRECT EXAMINATION**

BY MR. EVANS:

09:14:05:19   1

   2

   3     Q.    Ms. McGee, where do you currently reside?

   4     A.    In Smyrna, Tennessee.

09:14:13:18   5     Q.    And how long have you resided in Smyrna?

   6     A.    Nine years.

   7     Q.    And what's your address?

   8     A.    101 Batey Court, Smyrna, Tennessee.

   9     Q.    And who all lives in that residence with

09:14:29:15   10  you currently?

   11     A.    Just myself and my husband.

   12     Q.    And how long have you been married?

   13     A.    35 years.

   14     Q.    And can you describe for the Court the

09:14:42:11   15  layout of your home?

   16     A.    Yes.  It's a two-story Cape Cod style

   17  home.  There's four bedrooms.  It's 3800 square feet.

   18     Q.    And what do you do for a living?

   19     A.    I own a property preservation company.  I

09:15:02:12   20  manage foreclosed properties for banks and investors.

   21     Q.    And how long have you been so employed?

   22     A.    15 years.

   23     Q.    And does your husband work?

   24     A.    Yes, he does.

09:15:16:14   25     Q.    And what does he do?

09:15:18:23　1　　　　　　A.　　He's a machinist at Ashley Furniture.

　　　　　　　　2　　　　　　Q.　　And how long has he been employed in that

　　　　　　　　3　job?

　　　　　　　　4　　　　　　A.　　He's been there four years.  He had

09:15:28:26　5　retired from Gibson Guitar after 30 years.

　　　　　　　　6　　　　　　Q.　　Now, as part of your employment,

　　　　　　　　7　Ms. McGee, do you work at the home or from home or do

　　　　　　　　8　you go to an office?

　　　　　　　　9　　　　　　A.　　I work from home.

09:15:45:02　10　　　　　　Q.　　And is that consistent on a weekly basis?

　　　　　　　11　　　　　　A.　　Yes.

　　　　　　　12　　　　　　Q.　　Now, how do you know Justis Johnson?

　　　　　　　13　　　　　　A.　　She's my niece, my sister's daughter.

　　　　　　　14　　　　　　Q.　　And how long have you known her?

09:15:59:07　15　　　　　　A.　　Her entire life.

　　　　　　　16　　　　　　Q.　　And how old is Justis?

　　　　　　　17　　　　　　A.　　36.

　　　　　　　18　　　　　　Q.　　All right.  How would you describe your

　　　　　　　19　relationship with Justis Johnson?

09:16:07:27　20　　　　　　A.　　I feel like we have a really close

　　　　　　　21　relationship.  We spend a lot of time together.

　　　　　　　22　　　　　　Q.　　And at the time of Ms. Johnson's arrest

　　　　　　　23　on this case, where was she living?

　　　　　　　24　　　　　　A.　　Knoxville.

09:16:24:05　25　　　　　　Q.　　No, at the time of her arrest.  Last

09:16:26:01   1   week.

2          A.    Oh, I'm sorry.  She was living at a condo

3   I own in Murfreesboro.  It's 1016 Shaman Crossing.

4          Q.    You said that's a condo that you own?

09:16:38:08   5          A.    Yes.

6          Q.    Is that something you were renting to

7   her?

8          A.    Yes.

9          Q.    Now, if she were to be released, would

09:16:45:19  10   she be allowed to go back to that condo if the Court

11   were to allow her?

12          A.    Yes.

13          Q.    And you would be willing to continue to

14   rent that condo to her?

09:16:54:00  15          A.    Yes, I would.

16          Q.    Okay.  How long had she been living at

17   that condo?

18          A.    Since October.

19          Q.    Now, what's the layout of that condo?

09:17:08:03  20          A.    It's a two-story condo, three bedrooms.

21   Bedrooms are all upstairs, two bathrooms upstairs,

22   living room, kitchen and half bath downstairs.

23          Q.    And was anyone living there with her?

24          A.    No.

09:17:28:09  25          Q.    Now, to your knowledge was Ms. Johnson

09:17:33:04    1    working at the time she was arrested last week?

2         A.    Yes.

3         Q.    Where was she working?

4         A.    At First Call.

09:17:38:07    5         Q.    And do you know what First Call is?

6         A.    It's a restoration company, insurance

7    company.  I'm not exactly sure the -- of the actual

8    name, but she works as a public adjuster.

9         Q.    And do you -- do you know what her job

09:17:56:16    10    responsibilities were in that role?

11        A.    Yes.  She takes files from clients who

12    has either had a fire, some type of property damage,

13    and her company assists the client with going up

14    against the insurance companies that are not willing

09:18:16:09    15    to pay for the damages to the home.

16        Q.    And did she work from home or from an

17    office or both?

18        A.    Both.

19        Q.    Did her job in that role require her to

09:18:30:09    20    use a laptop computer?

21        A.    Yes.

22        Q.    And did it require access to Internet?

23        A.    Yes.

24        Q.    Have you always known Ms. Johnson to

09:18:44:21    25    work?

09:18:45:08    1          A.    Yes.

               2          Q.    Prior to her working for First Call, do

               3    you know where she worked at that time?

               4          A.    I believe it was Serve Pro or Service

09:18:53:11    5    Pro.

               6          Q.    Okay.  And do you know approximately how

               7    long she held that position?

               8          A.    I believe she was there for five years,

               9    I'm not exactly sure, maybe a little longer.

09:19:03:26   10          Q.    And where is Serve Pro located?

              11          A.    Knoxville, Tennessee.

              12          Q.    And so that brings me to my next

              13    question.  Prior to Ms. Johnson living in your condo

              14    here in the Middle District, where did she reside

09:19:16:20   15    before that?

              16          A.    She owned a home on Powell -- I'm sorry,

              17    Cedar Lane in Knoxville.  I think it's Powell.

              18          Q.    Does she still own that home as far as

              19    you know?

09:19:30:28   20          A.    She does.

              21          Q.    And how long did she live at that home on

              22    Cedar Lane in Knoxville?

              23          A.    Approximately three years.

              24          Q.    And does Ms. Johnson have children?

09:19:45:11   25          A.    Yes, she does.

09:19:46:14  1          Q.   How many children does she have?

            2          A.   Three.

            3          Q.   And do you know their approximate ages?

            4          A.   Yes.  Her oldest daughter is Adelyn is

09:19:54:16  5     14.  Her son Axle is eight and her daughter Monroe is

            6     seven.

            7          Q.   Do you remember there coming a time back

            8     around January of 2021 wherein her children were

            9     removed from her custody?

09:20:11:03 10          A.   Yes, I do.

           11          Q.   All right.  And as far as you know, is

           12     there a pending juvenile court matter in Knox County,

           13     Tennessee related to the custody of those children?

           14          A.   Yes.

09:20:24:14 15          Q.   Since January of 2021, has Ms. Johnson

           16     had custody of her three children?

           17          A.   No.

           18          Q.   And who particularly has had custody of

           19     them?

09:20:40:14 20          A.   Each person or?

           21          Q.   Yes, so the two younger children.

           22          A.   All right.  The two younger children are

           23     with their father, Jeremy Buchanan.

           24          Q.   Okay.  And the older child?

09:20:54:13 25          A.   She's currently with her father, Robert

09:20:57:16   1   Nicholson.

2   Q.   And has Ms. Johnson been allowed contact

3   with those children since January of 2021?

4   A.   Yes, she has.

09:21:11:17   5   Q.   And do you know whether or not that

6   contact is supervised or not?

7   A.   It is supervised.

8   Q.   And is it supervised with all three

9   children?

09:21:19:09  10   A.   Yes, it is.

11   Q.   And is that pursuant to an order from the

12   Knox County Juvenile Court?

13   A.   Yes.

14   Q.   And is that supervision required by that

09:21:31:18  15   order from the Knox County Juvenile Court?

16   A.   Yes.

17   Q.   Now, as to the two younger children,

18   Ms. Johnson's contact, is it in-person --

19   A.   Yes.

09:21:46:01  20   Q.   -- visits?

21   A.   Yes.

22   Q.   Okay.  But supervised?

23   A.   Yes.

24   Q.   Now, as to the oldest child, her

09:21:52:06  25   daughter, at this point in time, is she only allowed

| | | |
|---|---|---|
| 09:21:56:23 | 1 | Zoom visitation with that oldest child? |
| | 2 | A.    Yes, she is. |
| | 3 | Q.    So no in-person contact; correct? |
| | 4 | A.    Correct. |
| 09:22:08:28 | 5 | Q.    Have you also taken steps to reach out |
| | 6 | and gather character, reference letters in relation to |
| | 7 | Ms. Johnson? |
| | 8 | A.    Yes, I have. |
| | 9 | Q.    And did you receive a letter from Michael |
| 09:22:25:22 | 10 | Julian? |
| | 11 | A.    Yes, I did. |
| | 12 | Q.    And a letter from Joe McGee? |
| | 13 | A.    Yes, I did. |
| | 14 | Q.    And a letter from Kim Swarthout? |
| 09:22:45:00 | 15 | A.    Yes, I did. |
| | 16 | Q.    A letter from Selena Kuebler? |
| | 17 | A.    Yes, I did. |
| | 18 | Q.    A letter from Emma Peden? |
| | 19 | A.    Yes, I did. |
| 09:23:07:12 | 20 | Q.    A letter from Jessica Bissel? |
| | 21 | A.    Yes. |
| | 22 | Q.    Did you also draft a letter yourself? |
| | 23 | A.    Yes, I did. |
| | 24 | Q.    And did you reach out and speak with |
| 09:23:29:14 | 25 | someone named Logan Izzo? |

09:23:37:15    1        A.    Yes, I did.

2              MR. EVANS:  Your Honor, I previously

3    submitted a collective exhibit to the Court in

4    preparation for today.  It was entitled character

09:23:48:03    5    reference letters.  At this point in time I would

6    proffer those to the Court as the defendant's first

7    exhibit.

8              THE COURT:  All right, very good.

9    Ms. Morrison, you've seen these?

09:23:59:08   10              MS. MORRISON:  I have, Your Honor.  And I

11    have no objection.

12              THE COURT:  They'll be admitted.

13              (Defense Exhibit No. 1 was admitted.)

14    BY MR. EVANS:

09:24:09:03   15        Q.    Now, to your knowledge, does Ms. Johnson

16    currently have a valid US passport?

17        A.    Not to my knowledge, no.

18        Q.    And we talked a little bit about

19    Ms. Johnson able to remain in -- potentially remain in

09:24:29:12   20    the condo that you own.  Would you also be willing to

21    allow her to live in your home?

22        A.    Yes, I would.

23        Q.    Now, prior to today's hearing, did you

24    and I have a conversation about a concept called

09:24:40:21   25    third-party custodian?

09:24:41:09    1         A.    Yes, we did.

               2         Q.    And can you tell me, kind of, you know,

               3    in your own words what that -- what that meant to you.

               4    What does it mean to be a third-party custodian?

09:24:57:12    5         A.    To supervise Justis, to make sure that

               6    she's where she's supposed to be when she's supposed

               7    to be there, make sure she appears at all court

               8    hearings.  And that if she is out of line, if I don't

               9    know where she is or if I feel that she's trying to

09:25:21:16   10    flee, for whatever reason, I would contact you and the

              11    police department.

              12         Q.    Okay.  And even though she's your niece

              13    and you love her dearly, are you willing to take on

              14    that obligation?

09:25:36:09   15         A.    Yes, I am.

              16         Q.    Even if it means that if she violated a

              17    rule that she would go back to jail or get punished?

              18         A.    Yes.

              19         Q.    And do you take that obligation

09:25:47:00   20    seriously?

              21         A.    Yes, I do.

              22         Q.    Would you ever violate that obligation,

              23    even just to benefit Ms. Johnson?

              24         A.    No.

09:26:01:29   25         Q.    In preparation for today's hearing, did

| | | |
|---|---|---|
| 09:26:05:02 | 1 | you execute something called a Declaration of |
| | 2 | Third-party Custodian? |
| | 3 | A.    Yes, I did. |
| | 4 | Q.    And in that declaration -- let me ask you |
| 09:26:16:09 | 5 | this:  Did you sign it at the back? |
| | 6 | A.    Yes, I did. |
| | 7 | Q.    And is everything in that declaration |
| | 8 | true and correct to the best of your knowledge? |
| | 9 | A.    Yes. |
| 09:26:25:12 | 10 | MR. EVANS:  Your Honor, I would submit |
| | 11 | her third-party custodian declaration as the |
| | 12 | defendant's next exhibit. |
| | 13 | THE COURT:  All right.  Ms. Morrison, |
| | 14 | you've received that? |
| 09:26:36:06 | 15 | MS. MORRISON:  I have, Your Honor, and I |
| | 16 | have no objection. |
| | 17 | THE COURT:  It will be admitted as No. 2. |
| | 18 | (Defense Exhibit No. 2 was admitted.) |
| | 19 | BY MR. EVANS: |
| 09:26:42:06 | 20 | Q.    Now, one thing I do want to address and |
| | 21 | we talked about this morning, the Pretrial Services |
| | 22 | Report, as you and I discussed, noted a background |
| | 23 | check of you that revealed a prior arrest in 1985 for |
| | 24 | larceny and a prior arrest in '86 for fraudulent |
| 09:27:06:14 | 25 | activities out of the state of Michigan.  We talked |

09:27:09:20     1    about that this morning?

2         A.     Yes, we did.

3         Q.     All right. Have you ever been arrested

4    for larceny?

09:27:17:08     5         A.     No.

6         Q.     Have you ever been arrested for

7    fraudulent activities?

8         A.     I'm not sure what that is, but no.

9         Q.     As part of what you do in your role with

09:27:32:18    10    the foreclosed houses, are you required to submit to

11    frequent background checks in order to work closely

12    with investors and the banks?

13         A.     Yes.

14         Q.     And has that been done routinely --

09:27:47:15    15         A.     Yes.

16         Q.     -- over the years you've been in that

17    employment?

18         A.     Once a year.

19         Q.     Okay. And have you been able to see

09:27:52:09    20    those background checks when they come through?

21         A.     I've not actually been able to see them.

22         Q.     All right. Have you ever been given any

23    indication from those background checks that there's

24    been any prior -- any flag on your background check

09:28:07:27    25    for any prior arrest whatsoever?

09:28:10:06 1   A. No, I have not.  And I can tell you that

2 the subcontractors that I use, they also have to

3 submit a background check, and if there's any type of

4 larceny or -- any type of criminal activity, they're

09:28:25:09 5 not allowed to proceed.

6    Q. Now, I'm not asking you to explain how

7 this would have come about on your background check,

8 but, again, just to be clear, regardless of whether or

9 not this came up, you've never been arrested for those

09:28:44:28 10 two charges?

11    A. No.

12    Q. From your perspective this has to be some

13 sort of mistake?

14    A. Yes.

09:28:53:04 15    Q. Now, if the Court were to release

16 Ms. Johnson, there would almost assuredly be a number

17 of conditions that would be attached to that release.

18 Are you in a position where if the Court gave you

19 those conditions of release, you would be able to hear

09:29:12:08 20 them, understand them and make sure that Ms. Johnson

21 follows those conditions?

22    A. Yes.

23    Q. From what you know of Ms. Johnson, has

24 she been aware of this criminal investigation against

09:29:38:22 25 her out of the Eastern District since approximately

09:29:42:10    1    January 13 of 2021?

2         A.    Yes, she has.

3         Q.    All right.   And as it relates to the DCS

4    matter, has there been numerous court appearances in

09:29:54:05    5    the Knox County Juvenile Court?

6         A.    Yes, there has been.

7         Q.    And has Ms. Johnson appeared for all of

8    them?

9         A.    Yes, she has.

09:30:02:02   10         Q.    And even though she knew about this

11   criminal investigation since that time, has she made

12   any attempt whatsoever since January 13 of 2021 to

13   flee either the Eastern District of Tennessee or the

14   Middle District of Tennessee?

09:30:20:08   15         A.    No, she has not.

16         Q.    And do you have any reason to believe

17   right now that if she were to be released that she

18   would flee?

19         A.    No.

09:30:34:24   20         Q.    And from what you know of her current

21   employer, is it your understanding that she would be

22   able to keep that employment if she were to be

23   released today?

24         A.    That's my understanding, yes.

09:30:49:24   25         Q.    If for some reason the judge were to

09:30:52:27  1  order that she could not have any access to the

         2  Internet and that wouldn't be allowed as far as that

         3  current employment, are you aware of any other

         4  potential job opportunities for her that would not

09:31:05:07  5  require access to the Internet?

         6       A.    No, not at the moment, but I'm sure

         7  there's several that wouldn't require Internet access.

         8       Q.    And would you be able to help her explore

         9  those potential opportunities --

09:31:22:26  10       A.    Yes.

        11       Q.    -- to seek out employment?

        12       A.    Yes.

        13       Q.    And have you talked to your husband about

        14  the proposition of Ms. Johnson potentially moving into

09:31:33:19  15  your home?

        16       A.    Yes, I have.

        17       Q.    And is -- understanding what's -- would

        18  be required of you, is he okay with that?

        19       A.    Yes, he is.

09:31:42:14  20       Q.    Okay.

        21            MR. EVANS:  One moment, Your Honor.

        22            THE COURT:  Take your time.

        23            MR. EVANS:  Those are my questions.

        24            THE COURT:  Ms. Morrison,

09:39:12:20  25  cross-examination.

09:39:14:04   1              MS. MORRISON:  Thank you, Your Honor.

2                    **CROSS-EXAMINATION**

3    BY MS. MORRISON:

4         Q.    Ms. McGee, how many devices with Internet

09:39:17:25   5    access are there in your home currently?

6         A.    Two computers and then -- I mean, we

7    have, like, the TV.  I don't know if that's Internet

8    access, but.  And then our cell phone.

9         Q.    Okay.  So you and your husband each have

09:39:35:20  10    a cell phone.  If the Court orders that you cannot

11    have any -- first orders that your niece can be

12    released to your custody and is required to live at

13    your home and the Court further orders that there

14    cannot be any devices with Internet access, will you

09:39:55:21  15    still be able to do your job if you cannot have a

16    device with Internet access at your home?

17         A.    It would make it difficult, but I could

18    go elsewhere, I guess, to work.

19         Q.    What about your husband?  Does he -- I

09:40:10:20  20    know you said he doesn't work at home, but does any

21    part of his job require him to have access to a device

22    with Internet access?

23         A.    Well, we own several rental properties,

24    so we both kind of manage those.  (indiscernible),

09:40:30:17  25    again, like I said, we could go somewhere else to do

09:40:34:00  1    that, if needed.

2         Q.    Do you have any minors that visit your

3    home?

4         A.    No.

09:40:39:07  5    Q.    Are there any minors that live in your

6    neighborhood?

7         A.    I believe so, yes.

8         Q.    How close, if you know?

9         A.    Well, I live on a court, and we have two

09:40:59:28 10    and a half acres.  And they're kind of, like, across

11    the street I guess you would say.  Like, it's a

12    circle.

13        Q.    Okay.  Now, is your house that you live

14    in in proximity to any schools?

09:41:19:27 15        A.    We are approximately two miles from

16    school.

17        Q.    What about any day cares?

18        A.    No.

19        Q.    What about any parks?

09:41:30:09 20        A.    No, the park -- well, there's a park

21    that's maybe four miles away.

22        Q.    What about any shopping centers?

23        A.    No.

24        Q.    Any other areas where minors typically

09:41:40:23 25    congregate?

09:41:41:25   1          A.     No.

              2          Q.     Now, if the Court ordered that your niece

              3   could be released to your custody and was required to

              4   live at your home, would you be willing to disconnect

09:41:52:02   5   all of your devices with Internet access or remove

              6   them from the home?

              7          A.     If necessary, yes.

              8          Q.     Now, how far is the property where your

              9   niece is living from where you currently live?

09:42:07:12  10          A.     Six miles.

             11          Q.     Okay.  And I think you indicated in your

             12   third-party custodian declaration that you see her

             13   three times a week; is that accurate?

             14          A.     At least three times a week.  I see her

09:42:20:24  15   quite often, as often as we can.

             16          Q.     Do you still have a key to that property,

             17   even though she's living there now?

             18          A.     I do.

             19          Q.     Okay.  Do you know how many devices she

09:42:30:26  20   has with Internet access at that residence?

             21          A.     Well, I believe she has her personal

             22   computer and her work computer.  And work phone and a

             23   personal phone.

             24          Q.     And based on your prior testimony, it

09:42:47:15  25   sounds like she needs Internet access to do the work

09:42:51:20    1    that she's doing?

               2         A.    Yes, she does.

               3         Q.    At the home where your niece is living,

               4    are there any minors that live in that area?

09:43:02:02    5         A.    I don't know.

               6         Q.    Are there any schools in proximity to

               7    that location?

               8         A.    There's a school -- I'm not exactly sure.

               9    It's like three -- maybe three miles away, maybe four.

09:43:18:15   10    It's -- I don't know for sure, but it's not on top of

              11    her.

              12         Q.    What about the nearest park?  Is there a

              13    park in that area?

              14         A.    No.

09:43:30:03   15         Q.    What about any day cares?

              16         A.    Not that I'm aware of.

              17         Q.    What about any shopping malls?

              18         A.    There's no shopping malls, but there's,

              19    like, restaurants, like fast food restaurants near

09:43:42:13   20    there.

              21         Q.    Now, you indicated that you see the

              22    defendant at least three times a week.  When was the

              23    last time you were at the residence that you're

              24    renting to her?

09:43:56:29   25         A.    On -- it was the day before Good Friday.

09:44:00:05   1   I don't know what the date was.  It was the day before

2   she was arrested.

3        Q.   Okay.  And prior to that, when was the

4   last time you had been there, if you know?

09:44:11:00   5        A.   Maybe like a week before.  Like, she'll

6   cook dinner, I'll cook dinner.  So we do that, like,

7   quite often.

8        Q.   Okay.

9             MS. MORRISON:  I don't have any further

09:44:21:06  10   questions.  Thank you, ma'am.

11             THE COURT:  Any redirect, Mr. Evans?

12             MR. EVANS:  Yes, Judge.

13                    **REDIRECT EXAMINATION**

14   BY MR. EVANS:

09:44:27:11  15        Q.   Ms. McGee, you were asked about the

16   Internet devices in your home.  I believe you

17   testified there was two cell phones and two computers?

18        A.   Yes.

19        Q.   Are those cell phones password protected?

09:44:41:28  20        A.   Yes.

21        Q.   And as of right now, does Ms. Johnson

22   have access to the passwords to those devices?

23        A.   No, she does not.

24        Q.   Are those two computers password

09:44:56:06  25   protected?

09:44:58:01    1          A.    One is.

               2          Q.    All right.  The one that currently is

               3    password protected, did Ms. Johnson have the passwords

               4    to those computers?

09:45:07:21    5          A.    No.

               6          Q.    Or that computer?

               7          A.    Huh-uh (negative).

               8          Q.    And the other computer that you said

               9    isn't, can it be password protected?

09:45:14:09   10          A.    Yes, it can.

              11          Q.    And if the Court were to release her into

              12    your custody and there was a condition that those

              13    computers had to be password protected such that

              14    Ms. Johnson could not utilize them in any way, would

09:45:29:18   15    you be willing to password protect the third -- the

              16    fourth device, rather?

              17          A.    Yes.

              18          Q.    And would you likewise be willing to

              19    ensure that she not have -- ever have access to any of

09:45:43:02   20    the Internet devices?

              21          A.    Yes.

              22          Q.    And if she were to access an Internet

              23    device and you knew about it, would you be willing to

              24    report her to the United States Probation?

09:45:56:01   25          A.    (indiscernible).

09:45:59:26  1        Q.    That was, I'm sorry, yes?

           2        A.    Yes.

           3        Q.    And if the Court were to release her to

           4   the condominium that she'd been living in previously,

09:46:12:16  5   regardless of how often you interacted with her prior

           6   to this case, would you make those visits to that

           7   location more frequently if it were required of you?

           8        A.    Yes, I could.  And I could also control

           9   the access to the Internet.

09:46:26:19 10        Q.    Okay.  When you say control the access,

          11   you would be able to make sure she did not have

          12   Internet access at that location?

          13        A.    Yes, correct.

          14        Q.    And just to make sure I covered this, I

09:46:39:24 15   don't think I asked you this before, do you have any

          16   issue whatsoever with probation, Pretrial Services,

          17   making a visit to your home?

          18        A.    No.

          19        Q.    Or any issue whatsoever with anyone from

09:46:49:26 20   United States Probation, Pretrial Services from making

          21   a visit to the condo?

          22        A.    No, I do not.

          23             MR. EVANS:  Those are my questions.

          24             THE COURT:  All right.  Thank you,

09:47:03:20 25   Ms. McGee.  Appreciate your testimony.

| | | |
|---|---|---|
| 09:47:05:27 | 1 | *****WITNESS EXCUSED***** |
| | 2 | THE COURT:  Mr. Evans, do you have any |
| | 3 | other proof you want to put on? |
| | 4 | MR. EVANS:  No, Your Honor. |
| 09:47:09:25 | 5 | THE COURT:  All right.  Very good. |
| | 6 | The Court finds that through the |
| | 7 | testimony of Ms. McGee that the defendant has |
| | 8 | satisfied the relatively low burden of producing |
| | 9 | evidence to rebut the presumption in this case.  The |
| 09:47:31:00 | 10 | Court will nonetheless, of course, give appropriate |
| | 11 | consideration and weight to the presumption at the |
| | 12 | appropriate time, but I'll make that finding now. |
| | 13 | Ms. Morrison, do you have any proof you |
| | 14 | want to put on? |
| 09:47:42:16 | 15 | MS. MORRISON:  Yes, Your Honor.  At this |
| | 16 | time the United States would call Investigator Tom |
| | 17 | Evans. |
| | 18 | THE COURT:  All right.  Mr. Evans, let me |
| | 19 | swear you. |
| 09:47:50:26 | 20 | **TOM EVANS** |
| | 21 | called as a witness, after having been first duly |
| | 22 | sworn, testified as follows: |
| | 23 | THE COURT:  All right, very good.  Thank |
| | 24 | you.  If you'd state your name, please. |
| 09:48:01:07 | 25 | THE WITNESS:  Thomas Evans. |

09:48:02:05    1          THE COURT:  All right.  Ms. Morrison, you

2  may ask.

3          **DIRECT EXAMINATION**

4  BY MS. MORRISON:

09:48:04:24    5        Q.    Investigator Evans, where are you

6  currently employed?

7        A.    Knoxville Police Department.

8        Q.    In what capacity are you employed by the

9  Knoxville Police Department?

09:48:12:20   10        A.    I'm the investigator in the Internet

11  Crimes Against Children Task Force.

12        Q.    How long have you been employed in that

13  capacity?

14        A.    I've been with the KPD 26 years, in

09:48:24:01   15  Internet Crimes Against Children Unit for 22 years,

16  assigned to Homeland Security Investigations Task

17  Force for the past three years.

18        Q.    Are you familiar with Justis Johnson?

19        A.    Yes, ma'am, I am.

09:48:39:17   20        Q.    Are you able to see her on the screen

21  today?

22        A.    Yes.

23        Q.    Can you describe what she's wearing?

24        A.    Looks like a blue shirt, her hair's up,

09:48:55:28   25  in a cell.

09:48:56:27  1      Q.   Could you describe how you're familiar

2   with the defendant?

3      A.   She became the subject of an

4   investigation for the production and distribution of

09:49:07:11  5   child pornography.  We executed a search warrant at

6   her residence here in Knoxville back in January of

7   2021 and have identified her as the individual

8   responsible for the production and distribution of a

9   minor victim.

09:49:27:03  10     Q.   Now, could you describe how you

11  identified her as the individual who produced the

12  images in question?

13     A.   Yes, ma'am.  So my unit received

14  information from Homeland Security in Chicago.

09:49:43:13  15  Chicago Homeland Security Investigations Unit came by

16  information from a dark web called Public PedoPub.

17  This dark website catered to individuals who had

18  interest in sexually abusing and exploiting children.

19  That's what it was predicated on.

09:50:05:17  20           HSI Chicago was able to identify an

21  image -- two images of the same minor, but one

22  particular image that had EXIF data or GPS coordinates

23  associated with that image.  Through their

24  investigation, they identified the GPS coordinates and

09:50:29:17  25  linked that to an address in Powell, Tennessee.  They

09:50:35:29    1    did –– they did some research on the address and found

2    that Justis Johnson and a Brandon Cavanaugh were

3    associated with residing at that address.  They passed

4    that information along to HSI Knoxville and my

09:50:52:15    5    particular unit, and we worked together in identifying

6    the victim in this particular case.

7              We did some online searches, found a

8    Facebook page of Ms. Johnson's, I believe it was

9    Ms. Johnson or Brandon Cavanaugh.  There was a picture

09:51:14:11    10    of Ms. Johnson, Mr. Cavanaugh on the beach with three

11    children.  These three children were –– or had been

12    described in some chat communication within that

13    Public PedoPub chat room, and we were able to identify

14    the oldest as being the victim in one of those images

09:51:37:29    15    that had been uploaded.

16         Q.    Now, can you describe the images that

17    were uploaded to that particular dark website?

18         A.    Yes.  One –– one image was of the minor

19    child on her knees nude in the bathtub, apparently

09:52:00:12    20    shaving her legs.  She was nude from –– well, she was

21    totally nude.  You could see part of her face, enough

22    of the face to identify her, visually identify her.

23              The next image was an image of the same

24    minor in that bathtub/shower standing with her legs

09:52:25:09    25    spread, one leg propped up on the tub with shaving

09:52:29:18   1   cream on her left leg and that pink razor in her hand.

2          Q.     Now, Investigator Evans, are you familiar

3   with Government's Exhibit 1?

4          A.     Yes, I am.

09:52:44:17   5          Q.     Could you describe for the Court what

6   Government's Exhibit 1 is?

7          A.     This is communication attributed to the

8   subject of the investigation that uploaded those

9   images to this Public PedoPub website.  And this would

09:53:02:12   10  be the content of communication to the public chat

11  room there.

12         Q.     Now, based on what's contained in

13  Government's Exhibit 1, are you able to determine that

14  the individual who posted the images was also

09:53:27:11   15  responding to other individuals that were contained --

16  or that were in this particular chat room?

17         A.     Yes.

18         Q.     And so the information contained in

19  Government's Exhibit 1 relates to communications back

09:53:44:23   20  from the individual who posted the images?

21         A.     Correct.

22         Q.     So essentially it's a summary of that

23  particular person's responses?

24         A.     Correct.

09:53:55:06   25         Q.     Is that a fair and accurate

09:53:57:02     1    representation of those communications?

             2          A.     Yes, ma'am, it is.

             3          MS. MORRISON:   Your Honor, at this time I

             4    would move for the admission of Government's Exhibit 1

09:54:05:00     5    into evidence.

             6          THE COURT:   You've seen those, Mr. Evans?

             7    Luke Evans.

             8          MR. EVANS:   Yes, Your Honor, I've seen

             9    them.

09:54:12:15    10          THE COURT:   All right.   They'll be

           11    admitted.

           12          (Government Exhibit No. 1 was admitted.)

           13    BY MS. MORRISON:

           14          Q.     Investigator Evans, using the contents of

09:54:19:20    15    those chats, was Homeland Security and then your

           16    office able to identify the defendant and the minor

           17    victim in this case?

           18          A.     Yes.   Just the contents of the chat, the

           19    communication themselves was not the determining

09:54:39:28    20    factor on who it was that was sitting behind the

           21    computer or phone at that time.   Based on my

           22    experience with online investigations, it indicated to

           23    me, this communication, that it was a female and it

           24    was the mother, in all likelihood, of these children

09:55:00:12    25    that was posting these images and communicating in

09:55:04:06    1    this manner.  However, statistically over the years,

2    it's very rarely a woman.  It's generally a male.

3         So we did not discount Brandon Cavanaugh

4    at that time as possibly being involved in this as

09:55:21:03    5    well.  We were able to identify the victim, though,

6    just by facial comparison between Facebook pictures,

7    school fact sheet picture and then the picture that

8    was uploaded to the web.

9         Q.    Based on the information that was

10:11:34:08   10    included in the chats, do you believe that there were

11    additional images that had not been, in fact --

12    additional images of the same nature that had not been

13    uploaded yet to the dark room chat?

14         A.    Yes.  I believe there were videos at some

10:11:50:21   15    point that had attempted to been -- that were

16    attempted to have been uploaded to that room, but the

17    user was having a hard time doing that, could not do

18    that.  So they -- the individual then took still

19    pictures of the video and uploaded those, were able to

10:12:11:06   20    upload those to the website.

21         Q.    Now, you've testified about difficulty

22    this individual had in uploading the videos.  Do you

23    attribute the fact that there were multiple usernames

24    as a consequence of having difficulty uploading the

10:12:34:00   25    videos and essentially getting kicked off the platform

10:12:37:13    1    or out of the chat room?

2    A.    Well, I think -- I think she says it

3    herself.  I'm a dark web noob, meaning they're new.

4    So it's not a -- it's not a very user friendly

10:12:50:18    5    environment.  It takes some getting used to in this

6    particular environment.  It's not really a point and

7    click.  They're -- and I've been to this particular

8    chat room.  And so it is -- it is somewhat different

9    than what we are used to in Facebook Messenger or

10:13:08:29   10    texting.  It is different.  So it is -- there is a

11    learning curve as far as uploading files to the

12    website.

13    Q.    Now, based on the contents of these

14    chats, is there any indication that only -- let me ask

10:13:30:05   15    this a different way.

16         Based on the contents of the chats, do

17    you believe that there may have been sexual contact

18    between the defendant and the minor victim?

19    A.    It indicates there was.

10:13:43:19   20    Q.    Could you be -- could you be more

21    specific about what leads you to believe that based on

22    the contents of the chats?

23    A.    I believe there was a statement that oral

24    sex has been performed by the subject on the minor, as

10:13:57:26   25    well as other things.

10:14:00:02   1          Q.    Was there a reference about purchasing
              2    panties for the minor victim?
              3          A.    Yes, there was.
              4          Q.    Now, you testified that a number of
10:14:14:06   5    search warrants were executed in this case.  Could you
              6    describe the circumstances surrounding the execution
              7    of the first search warrant?
              8          A.    Well, the execution of the first search
              9    warrant I think occurred on the 14th of January.  We
10:14:35:17  10    had received information in early January, had
             11    attempted to do surveillance at that property in
             12    Powell.  Very difficult to surveil.  It was on a
             13    cul-de-sac.  We could -- we attempted to put her
             14    vehicle there or a vehicle there registered to her.
10:14:55:20  15    Every time we went by we couldn't -- couldn't put a
             16    vehicle there.
             17               We knew that she and Brandon Cavanaugh
             18    both worked at Serve Pro.  A decision was made to go
             19    to Serve Pro and try to determine work schedules and
10:15:20:25  20    where people were working from.  This was still in the
             21    COVID days where people -- a lot people were still
             22    working from home.  And we were limited, really, on
             23    what we were doing in the field at that time.  We did
             24    make contact with the management at Serve Pro.  I
10:15:39:02  25    advised them of the type of investigation it was and

10:15:43:20   1   it was very confidential and highly sensitive, but we

2   were trying to determine where she was at most of the

3   time.  They told us that she'd be working from home in

4   all likelihood.

10:15:57:05   5       We had conversation with management, left

6   a card there, and then we decided to apply for a

7   search warrant for that residence for any electronic

8   items and phones, which we did.  We secured that

9   warrant and then we executed that warrant.

10:16:19:29   10       Q.    What happened after the execution of the

11   search warrant?

12       A.    Mr. Cavanaugh was interviewed there.

13   Ms. Johnson was interviewed as well.  Items were

14   confiscated from -- from the residence.  DCS had been

10:16:37:03   15   notified of the type of investigation, so they

16   responded to the residence and made a determination

17   on -- of what to do with the children at that time.

18   Tough situation.

19       Both Johnson and Cavanaugh denied any

10:16:57:01   20   knowledge of pictures being taken or uploaded to the

21   dark web.  Both, I think, identified the girl in the

22   picture and the bathroom in which it was taken.  Both

23   identified that.  We left.  Later on that evening took

24   our devices back to the ICAC offices at that point.

10:17:29:09   25       Q.    Now, Investigator Evans, were you present

| | | |
|---|---|---|
| 10:17:32:08 | 1 | at the home when the search warrant was executed? |
| | 2 | A.    Yes, ma'am, I was. |
| | 3 | Q.    Did you have the opportunity to view the |
| | 4 | bathroom where these images were created? |
| 10:17:41:06 | 5 | A.    I did. |
| | 6 | Q.    Now, based on what you saw about the |
| | 7 | bathroom, is there any way that the minor victim could |
| | 8 | have photographed herself? |
| | 9 | A.    The bathroom wasn't set up in that |
| 10:17:55:08 | 10 | manner.  There was just a wall and no table, no |
| | 11 | counter, no chair, nothing to be able to put that -- |
| | 12 | to put a phone on and take that type of picture. |
| | 13 | Q.    Based on your observation of the |
| | 14 | bathroom, is it your belief that someone had to take |
| 10:18:19:07 | 15 | that photograph of the minor victim? |
| | 16 | A.    Yes, ma'am. |
| | 17 | Q.    Now, when you interviewed the defendant, |
| | 18 | was there anything about her questions or her |
| | 19 | statements about EXIF data that you found interesting? |
| 10:18:36:09 | 20 | A.    Well, the interesting initial part of the |
| | 21 | files that were uploaded is the first file that was |
| | 22 | uploaded had EXIF data or metadata attached to it. |
| | 23 | That's information about the file.  And so it contains |
| | 24 | date, time, type of camera that may have been used. |
| 10:18:55:18 | 25 | It could contain GPS coordinates.  It could contain a |

10:19:00:11  1   whole host of information about the device that

2   actually took the picture.

3          Sometimes you don't get that and you

4   can -- you can program your phone not to include

10:19:14:24  5   certain data in the pictures that you take.  The first

6   picture had GPS data.  Apparently, based on the

7   communication, someone in the chat room downloaded

8   that file, they viewed the EXIF data of that file --

9   not unlike what we would do as investigators.  Viewed

10:19:36:21  10   the EXIF data of that file.  They were able to see the

11   date, time.  They were able to see the GPS coordinates

12   and they plotted those in either Google Earth or some

13   Internet search engine and they were able to tell the

14   subject that here is your home address, 7905

10:20:01:26  15   Cedarstone Lane.  They were able to tell her that in

16   some manner.  And she responds by then taking the

17   EXIF data out of the second picture that's uploaded to

18   the dark web.

19          Additionally, she states in the

10:20:20:18  20   communication, someone told me -- she states it

21   publicly to the room, someone told me my home address.

22   Thank you for bringing that to my attention, I'm

23   paraphrasing that.  So that -- that was very

24   concerning.  And when we asked, my partner asked about

10:20:41:21  25   the EXIF data, one of her initial statements was, it

10:20:45:14    1    can be changed.  When he indicated that that's how we

2    got to the house was those GPS coordinates associated

3    with one of those images, she made the statement, it

4    can be changed.

10:21:03:10    5         Q.    I assume that the devices that were

6    seized in connection with the execution of her search

7    warrant were searched?

8         A.    Yes.

9         Q.    Could you describe what was located

10:21:13:06   10    during the search?

11         A.    Well, one of the first -- one of the

12    first items that we wanted to take a look at was her

13    personal cell phone.  It had been taken, secured in a

14    Faraday bag and transported back to our office.  When

10:21:29:18   15    the cell phone was taken out of the Faraday bag, it

16    had been wiped remotely, so there was no -- there was

17    some data on that phone, but not much.  Not what we

18    expected to have been there.

19              We were able to find some information off

10:21:52:01   20    one of her devices, I believe it was her phone,

21    regarding a text communication she had had with

22    Brandon Cavanaugh a few days prior to the execution of

23    the search warrant where she had apparently located a

24    business card that I had left at Serve Pro with

10:22:12:06   25    management, taken a picture of that and sent that to

10:22:16:04   1   Brandon Cavanaugh.  So at that point we knew that she

2   had had advance notice that there were probably

3   investigators looking at her for the distribution of

4   those child pornography images she uploaded to the

10:22:32:15   5   dark web.

6          Exams have been done on multiple items.

7   There had been child pornography found on a laptop

8   computer that we gained through a secondary search.

9   They had hidden that -- they'd hidden that computer

10:22:52:27   10   fairly well when we got there to do the first search.

11   That computer had been hidden.

12          Q.   So let me ask you this:  Were you able to

13   determine when her personal cell phone had been wiped?

14          A.   Well, we believe it was that night.  I

10:23:11:18   15   don't know if I could give you that time, but we had

16   it in our possession and it was, as any cell phone

17   would be, functioning.  It goes into a Faraday bag,

18   and then we get it out a few hours later at the office

19   and there had been a remote wipe of the phone.

10:23:31:23   20          Q.   So is it your understanding that the

21   remote wipe occurred after the execution of the search

22   warrant?

23          A.   That's correct.

24          Q.   What would be the purpose of putting the

10:23:41:28   25   phone in a Faraday bag?

10:23:43:19    1        A.    Well, to eliminate that possibility.

2    It's not always easy and you can't always put a phone

3    in airplane mode. Sometimes you actually have to have

4    the passcode to do that. I'm not familiar -- I didn't

10:23:58:09    5    see her phone and I didn't seize it, one of our

6    technicians did, but generally put those in the

7    Faraday bag to eliminate the possibility of a remote

8    wipe, of network access.

9        Q.    Now, was the defendant's personal cell

10:24:13:12    10    phone the only device that had been wiped?

11        A.    I think there had been another cell phone

12    that had been reset a few days earlier. That's all I

13    can remember. I know that the secondary computer, the

14    secondary search warrant that was executed to recover

10:24:39:05    15    that computer that had been placed up in the attic

16    under the insulation, I know that that computer had

17    been reset, that Asus laptop computer, and the reset

18    date was January the 15th. January the 15th.

19        Q.    That was after the execution of the

10:24:58:04    20    search warrant?

21        A.    That was after the execution of the

22    search warrant. And some examination done on that

23    corroborates some information that Mr. Cavanaugh had

24    given us at a later date regarding going to McDonald's

10:25:14:29    25    and using the McDonald's wi-fi to eliminate online

10:25:21:26  1    accounts.

2         Q.    Let's talk about that.  How did you learn

3    that this had occurred?

4         A.    At the -- Mr. Cavanaugh, through his

10:27:12:02  5    attorney, made contact with the US Attorney's Office

6    and law enforcement after the -- a number of days

7    after the search warrant, the first search warrant had

8    been executed.  He indicated he wanted to come in and

9    speak to investigators regarding the investigation,

10:27:28:05  10   that he had not been honest at the time we interviewed

11   him at the house.

12              He came in with his lawyer, sat down and

13   talked to us and he detailed the fact that we

14   didn't -- we didn't get everything.  That he was in

10:27:45:09  15   fear of Justis Johnson, that he was scared --

16   physically scared of her.  He was worried about

17   retaliation.  That he had talked her into keeping the

18   laptop, not getting rid of it, but just hiding it.

19   And that she had been up the past few days on that

10:28:11:27  20   laptop trying to clean it up is what he indicated.

21        Q.    Was he able to provide you with a

22   location for the laptop?

23        A.    He did.  He said it was up in the attic,

24   three beams to the front of the house and under a

10:28:32:25  25   truss or something.  It was pretty good directions on

| | | |
|---|---|---|
| 10:28:35:17 | 1 | where it was located, and it was in a plastic -- a |
| | 2 | white plastic bag. |
| | 3 | Q. Was this -- was it his understanding that |
| | 4 | this laptop had been concealed so it could not be |
| 10:28:46:14 | 5 | located during any search? |
| | 6 | A. Yes. |
| | 7 | Q. Was this particular laptop forensically |
| | 8 | examined? |
| | 9 | A. Yes. |
| 10:28:56:20 | 10 | Q. What was located during the examination |
| | 11 | of this particular laptop? |
| | 12 | A. We found numerous -- the laptop was |
| | 13 | reset, so there was a lot -- there was a lot of data |
| | 14 | that had been removed, deleted, unable to be |
| 10:29:11:02 | 15 | recovered. However, we did recover some Tor website |
| | 16 | fragments pointing to child pornography Tor websites. |
| | 17 | We found some child pornography that we see in our |
| | 18 | everyday investigations of the receipt, possession and |
| | 19 | distribution of child pornography. |
| 10:29:41:16 | 20 | We did not find any images of the victim |
| | 21 | on the laptop. I believe we did find some email |
| | 22 | fragments from Justis Johnson's gmail account. One of |
| | 23 | her gmail accounts regarding a confirmation of the |
| | 24 | evil -- the Tor Evil Onion browser. So it appeared |
| 10:30:11:09 | 25 | that she'd made an online app purchase through the |

| | | |
|---|---|---|
| 10:30:16:12 | 1 | Apple app store to download this browser in order to |
| | 2 | navigate the dark web.  And the Tor touts itself as an |
| | 3 | anonymizer.  If you use that, it hides and masks your |
| | 4 | IP address. |
| 10:30:38:14 | 5 | Q.    Were any noncontraband photos of the |
| | 6 | defendant and her minor children located on that |
| | 7 | laptop? |
| | 8 | A.    I believe so.  I think they were more -- |
| | 9 | yes, I believe so. |
| 10:30:56:15 | 10 | Q.    Is there any indication that this laptop |
| | 11 | was used by Mr. Cavanaugh? |
| | 12 | A.    Not of any consequence.  I think there |
| | 13 | may be some references to some of his schoolwork where |
| | 14 | he's logged in to check schoolwork and maybe some -- |
| 10:31:20:21 | 15 | online Amazon purchase, but that's -- that's all I can |
| | 16 | remember from the -- that's a lot of material that |
| | 17 | we've looked through on this particular case. |
| | 18 | Q.    During the course of your investigation, |
| | 19 | did you locate any information that indicated |
| 10:35:32:14 | 20 | Mr. Cavanaugh was involved in the production of these |
| | 21 | contraband images? |
| | 22 | A.    No, not that he was involved in the |
| | 23 | production.  But we did have information that he was |
| | 24 | aware of it.  That he became aware of it after the |
| 10:35:49:01 | 25 | production and after the files had been distributed, |

10:35:51:08  1   he was advised.

2        Q.    At some point did he indicate that the

3   defendant had actually sent him these images of the

4   minor victim that were actually posted in this dark

10:36:12:19  5   web chat room?

6        A.    Yes, he indicated that she had sent some

7   images through Snapchat.

8        Q.    Did he retain copies of these images?

9        A.    He was able to take a picture of the

10:36:24:29 10   screen on his phone.  So, yes.

11        Q.    Did he -- I'm sorry to interrupt you,

12   sir.  Did he say why he had taken copies of those --

13   or taken photos of the images he received via

14   Snapchat?

10:36:37:19 15        A.    He said he thought he might need them

16   down the road, that -- that's what he said.

17        Q.    Was he concerned about potential

18   retaliation or something of that nature?

19        A.    He said he was concerned for the kids,

10:36:57:03 20   but he was also concerned for himself, as far as

21   retaliation.  And that's -- that word was also used by

22   the -- by Johnson's sister as far as retaliation.  She

23   is concerned about that as well.

24        Q.    When you met with Brandon Cavanaugh, did

10:37:21:27 25   he disclose that there had been prior incidents of

10:37:26:00    1    domestic violence with the defendant?

2    A.    He indicated that, yes.  And we found a

3    video, a self-produced video by Mr. Cavanaugh showing

4    and detailing a domestic situation that he'd had with

10:37:41:27    5    Ms. Johnson after they had been out drinking and he --

6    he indicated they had used some drugs, I believe

7    cocaine is what I remember, which he said that he or

8    she would get through an individual at Serve Pro.  But

9    he did indicate that in this video he showed marks of

10:38:05:14   10    his face and his lip where he had been, it appeared,

11    hit and scratched.

12    Q.    To your knowledge, were any of these

13    incidents ever reported to law enforcement?

14    A.    No.

10:38:19:06   15    Q.    Now, were you able to corroborate any of

16    Mr. Cavanaugh's statements through the forensic

17    examination of these devices?

18    A.    Well, it appeared that what he said in

19    the way of violence being recent, where she found my

10:38:40:11   20    business card; that after the execution of the

21    warrant, she advised him that they were going to get

22    in the car, drive down to Serve Pro and get his iPad

23    from the work truck and then go and start making

24    changes to online accounts, namely the Apple accounts.

10:39:06:13   25    I think most of the iCloud accounts, if not all the

10:39:09:06   1   iCloud accounts, I believe, were deleted.

             2          So he indicated they'd gone to McDonald's

             3   and accessed the Internet from there.  I think I saw

             4   an Internet access from Serve Pro from that laptop.

10:39:26:15   5   And then another access from a US Cellular hotspot is

             6   what we documented on that Asus laptop, I believe.  So

             7   that indicated that what he was saying to us, was, in

             8   fact, true.  I'll just -- that's all I can --

             9          MR. EVANS:  I'm going to object to

10:39:53:18  10   him giving any opinion on the truth or veracity of

            11   someone's statement to him, whether -- I don't think

            12   that's relevant.  Your Honor is in charge of

            13   determining credibility.

            14          THE COURT:  I'll give it whatever weight

10:40:06:05  15   it's due.

            16   BY MS. MORRISON:

            17      Q.    Investigator Evans, you indicated that

            18   the defendant's sister was concerned about retaliation

            19   in this matter.  At one point after the execution of

10:40:19:03  20   the search warrants, was the minor victim residing

            21   with the defendant's sister?

            22      A.    Yes, she was.

            23      Q.    Now, while the minor victim was residing

            24   with the defendant's sister, was there communication

10:40:35:02  25   between the defendant and the victim that was

10:40:38:16    1    occurring that was in violation of the juvenile court

               2    order?

               3            A.    Yes.    Information we had through DCS

               4    indicated that there were multiple violations of that

10:40:50:24    5    order of supervised communication.    That's what we had

               6    been advised.

               7            Q.    How did the defendant's sister learn of

               8    the -- let me strike this and ask it a different way.

               9            During the course of the investigation,

10:41:09:15   10    were you provided with screenshots that were taken by

              11    the defendant's sister?

              12            A.    Yes.

              13            Q.    What was depicted in these particular

              14    screenshots that the defendant's sister took?

10:41:22:07   15            A.    At this particular time the victim was no

              16    longer residing full-time with the sister.    The

              17    sister -- it had been increasingly difficult to

              18    control her.    I think her behavior was -- she was

              19    acting out.    The sister has other children, and it was

10:41:41:17   20    creating a problem within the home.    And so she had

              21    told -- I believe she advised DCS that she can no

              22    longer care for the victim.    At that point the victim

              23    was then going to live with the father, biological

              24    father, Whitt Nicholson.

10:42:02:17   25                    One day after school I think she brought

| | | |
|---|---|---|
| 10:42:07:01 | 1 | the victim to her home for a short period of time for |
| | 2 | Mr. Nicholson to get off work and then come pick her |
| | 3 | up.  During that time the victim asked to use her |
| | 4 | laptop to do some schoolwork.  She'd left her |
| 10:42:24:04 | 5 | Chromebook at school -- |
| | 6 | MR. EVANS:  Judge, I'm going to object at |
| | 7 | this point at that overall reliability.  I think this |
| | 8 | is getting into an issue where we're probably multiple |
| | 9 | people deep on hearsay and I understand hearsay's |
| 10:42:37:04 | 10 | allowed.  But when we're talking about the victim's |
| | 11 | sister -- or, excuse me, Ms. Johnson's sister and |
| | 12 | information that was relayed to this agent from her |
| | 13 | and potentially from others, Your Honor, I think |
| | 14 | this -- this is not appropriate for this -- for this |
| 10:42:55:18 | 15 | Court.  I'd ask that the Court exclude it. |
| | 16 | THE COURT:  I think this is somebody |
| | 17 | else's sister.  I don't know whose sister this is. |
| | 18 | We're multiple sisters in at this point, it seems |
| | 19 | like. |
| 10:43:04:18 | 20 | Ms. Morrison, can you clean this up a |
| | 21 | little bit?  I'll let you put the testimony on, but I |
| | 22 | don't want a who-shot-John about every single line of |
| | 23 | hearsay this went through.  What's the point? |
| | 24 | MS. MORRISON:  I'm happy to do that, but, |
| 10:43:17:13 | 25 | Your Honor, this goes to danger to the community and |

| | | |
|---|---|---|
| 10:43:19:18 | 1 | danger to the particular victim in this case and the |
| | 2 | defendant's willingness to comply with any conditions |
| | 3 | of release that this Court might order. |
| | 4 | THE COURT:  That's why I told you I'm |
| 10:43:29:25 | 5 | going to let you put it on, but just clean it up.  You |
| | 6 | can lead if you need to. |
| | 7 | BY MS. MORRISON: |
| | 8 | Q.    Investigator Evans, who is Mikel Richert? |
| | 9 | A.    That is the sister of Justis Johnson. |
| 10:43:43:21 | 10 | Q.    At some point was the minor victim, the |
| | 11 | defendant's daughter, living with Mikel Richert? |
| | 12 | A.    Yes. |
| | 13 | Q.    Did Mikel Richert let the minor victim |
| | 14 | use Mikel's laptop when the minor victim came to her |
| 10:43:58:09 | 15 | home? |
| | 16 | A.    Yes. |
| | 17 | Q.    What happened when the minor victim used |
| | 18 | Mikel Richert's laptop? |
| | 19 | A.    She logged in to her school account and |
| 10:44:07:08 | 20 | then left the home and did not log out.  Ms. Richert |
| | 21 | observed the account open.  She observed draft |
| | 22 | communications between the victim and the mother.  And |
| | 23 | that was the way that they had learned to communicate |
| | 24 | in a secure fashion.  The daughter gave the mother the |
| 10:44:31:28 | 25 | password and username for her school account and they |

| | | |
|---|---|---|
| 10:44:35:12 | 1 | would create drafts to one another and not send the |
| | 2 | email. |
| | 3 | She captured that. She sent that to me |
| | 4 | and she also captured IP addresses that had logged in |
| 10:44:47:12 | 5 | to that gmail, school gmail account, one of which came |
| | 6 | back to the 7905 Cedarstone Lane in Powell, which is |
| | 7 | Justis Johnson's Internet service. And other came |
| | 8 | back to Joseph McGee at 101 Batey Court in Smyrna, |
| | 9 | Tennessee. |
| 10:45:10:04 | 10 | Q. Who is Joseph McGee? |
| | 11 | A. That is, we believe, the husband of Biane |
| | 12 | McGee. |
| | 13 | Q. Now, at the point in time where these |
| | 14 | drafts were being written in the email account of the |
| 10:45:22:24 | 15 | minor victim but not sent, was this type of contact |
| | 16 | permitted by the juvenile court? |
| | 17 | A. It was not allowed. |
| | 18 | Q. Was there also a website called |
| | 19 | mikelrichert.com that was created? |
| 10:45:36:23 | 20 | A. There was. |
| | 21 | Q. Can you describe what was on that |
| | 22 | particular website? |
| | 23 | A. Ms. Richert was receiving -- |
| | 24 | MR. EVANS: Objection. Judge, I -- I |
| 10:45:47:07 | 25 | don't know how this goes to dangerousness or risk of |

10:45:49:29    1    flight.

2    THE COURT:  Ms. Morrison.

3    MS. MORRISON:  Your Honor, I think it's

4    relevant to dangerousness.

10:45:55:03    5    THE COURT:  I'll let you ask.  It will be

6    overruled.

7    BY MS. MORRISON:

8    Q.    Investigator Evans, could you describe

9    what was depicted on this particular website?

10:46:06:17    10    A.    Ms. Richert, it was a picture of

11    Ms. Richert performing oral sex on an adult male.

12    Underneath the picture it had in her name, full name,

13    date of birth, Social Security number and address.

14    Q.    Were you able to determine who created

10:46:24:03    15    that particular website?

16    A.    I issued a subpoena for records to Info

17    Maniac in Sweden.  They complied.  They said that

18    Justis Johnson at 7905 Cedarstone Lane in Powell had

19    created it.  It listed IP addresses that had logged

10:46:49:09    20    into that site.  I think one of the IPs came back to

21    First Call where she now works and another comes back

22    to Joseph McGee in Smyrna, Tennessee.  Those are two

23    of the -- two other IPs were anonymous VPN IP

24    addresses.

10:47:10:19    25    Q.    Do you know approximately the timeframe

10:47:14:25   1    that this particular website was created?

2          A.    It was about the time that Mikel Richert

3    had decided that she just couldn't -- couldn't handle

4    taking custody of the child anymore.

10:47:31:29   5          Q.    Now --

6          THE COURT:  Wait, when is that?

7          THE WITNESS:  I cannot remember the date

8    on that.  I mean, it was --

9          THE COURT:  How about a year, even?

10:47:46:03   10         THE WITNESS:  It would have been 2021.

11   BY MS. MORRISON:

12         Q.    Investigator Evans, on April 11 of 2022,

13   were flowers delivered for the victim at her school?

14         A.    Yes.

10:48:04:14   15         Q.    Could you describe what you learned about

16   how the flowers were delivered and who ordered them?

17         A.    Yes.  I was contacted by the biological

18   father, Whitt Nicholson.  He indicated the school

19   contacted him regarding some flowers that were being

10:48:22:06   20   delivered to Adelyn.  He -- I think the school put a

21   hold on those, knowing that there was a situation that

22   DCS was involved in.  And generally they don't allow

23   flowers just to go to children there at the school

24   during school hours.  He told me about that, indicated

10:48:46:12   25   where the flowers had come from.  I made contact with

10:48:49:21    1    the florist who took the order for the flowers.  An

2    individual by the name of Ames Brown had ordered those

3    flowers and had them sent to Adelyn.

4              The card, although I can't remember

10:49:05:22    5    exactly what the card says, it was a Have a Good Day

6    type of card, signed Felicia.  And Ames Brown had told

7    the store owner that he was getting flowers for his

8    girlfriend's daughter.

9         Q.    Were you able to determine Ames Brown's

10:49:25:18   10    connection to the defendant?

11         A.    Yes.  Ames Brown's name had come up

12    around that same time by Whitt Nicholson, the neighbor

13    had identified his car and took a picture of his

14    license plate at Whitt Nicholson's house.  Ames Brown

10:49:48:15   15    lives on Sky Top Lane in Powell, Tennessee.  And

16    apparently is where Justis Johnson meets with her two

17    youngest children.

18              Mr. Brown has a handgun carry permit and

19    was seen at the residence of Whitt Nicholson where the

10:50:06:25   20    victim resides delivering some type of package, and

21    this was around the time of the youngest son's, Axle's

22    birthday, I believe.

23         Q.    And, I'm sorry to interrupt you, sir.  Is

24    Ames Brown known to Whitt Nicholson?

10:50:25:12   25         A.    He is now.

10:50:27:07   1         Q.    But prior to delivering of the package or

2    the flowers had no connection to the defendant -- to

3    Mr. Nicholson?

4         A.    Not that I know of.

10:50:36:21   5         Q.    Have you been able to determine nature --

6    determine whether or not he has a relationship with

7    the defendant?

8         A.    We believe he does based on calls to the

9    jail.  He tells her he loves her.  They respond in

10:50:53:13  10   kind.  We believe he's living at that townhome in

11   Smyrna at this time.  We believe he is there and has

12   stayed there based on information we have from the

13   jail phone calls.

14        Q.    The timeframe when he -- Mr. Brown was

10:54:09:11  15   seen in the vicinity of Whitt Nicholson's home, was

16   that before or after the flowers were delivered?

17        A.    I think that was before.

18        Q.    Was it within a week or two weeks?

19        A.    It was in a couple weeks of one another,

10:54:29:07  20   I believe.

21        Q.    Besides the draft emails that were

22   located in the minor victim's school email account,

23   are you aware of any other violations that the

24   juvenile court ordered regarding contact between the

10:54:45:13  25   defendant and minor victim?

10:54:50:04   1        A.    DCS has documented a number of

2   violations.  I can speak to the fact that there's been

3   some communication over text where Whitt Nicholson has

4   seen texts that the mother is indicating to the

10:55:08:06   5   daughter, go get the Signal app, have your friends

6   download the Signal app.  That way we can be safe or

7   communicate safer.

8            We have information that the victim's

9   been using phones from school friends to communicate

10:55:28:02   10   through texts with the mother.  We believe there's

11   Instagram accounts that have been set up and used.

12   There is currently some court process issued on some

13   of those accounts.

14            There's also an incident at the school

10:55:45:19   15   where the child got in trouble and the teacher told

16   her to call her custodian.  We believe the child

17   called her mother.  The teacher spoke to the mother.

18   The mother appeared -- pretended to be Mikel Richert,

19   the custodian of the child at that time, through the

10:56:07:13   20   conversation.

21            MR. EVANS:  Judge, again, I'm going to

22   object as to the -- based on the earlier reliability

23   objection for the purposes for this hearing being as

24   to dangerousness and risk of flight.

10:56:22:19   25            THE COURT:  I think compliance with other

10:56:24:03  1    court orders is relevant.  But, again, let's -- let's

2    clean things up and cut to the chase a little bit.

3    BY MS. MORRISON:

4         Q.    Investigator Evans, were you able to

10:56:36:06  5    verify that the victim did not, in fact, call Mikel

6    Richert and the school did not, in fact, communicate

7    with Mikel Richert on that occasion?

8         A.    The teacher confirmed that.

9         Q.    Is there anything else that you think the

10:56:53:06  10   Court should know about any violations of the juvenile

11   court order regarding contact between the defendant

12   and the minor victim?

13        A.    Other than it's just been consistent.

14   It's been consistent.  Every couple of months we hear

10:57:10:27  15   of some other manner in which she is attempting to

16   contact the victim in this case.

17        Q.    Investigator Evans, do you believe that

18   the defendant poses a danger to the minor victim if

19   she is released?

10:57:24:23  20        A.    I do.

21        Q.    Could you explain for the Court what your

22   concerns are?

23        A.    One, I think that she's going to continue

24   to try to contact this victim.  I just don't think

10:57:36:21  25   that's going to stop.

| | | |
|---|---|---|
| 10:57:39:12 | 1 | MR. EVANS:  Objection.  His speculation |
| | 2 | going forward is not relevant. |
| | 3 | THE COURT:  I want to know what the harm |
| | 4 | is.  What's the harm, Mr. Evans? |
| 10:57:53:19 | 5 | THE WITNESS:  She tried to manipulate |
| | 6 | this child to not disclose that she took pictures of |
| | 7 | her and distributed those on the Internet. |
| | 8 | THE COURT:  Well, where -- what is the |
| | 9 | evidence of that?  You haven't said anything about |
| 10:58:04:00 | 10 | that yet. |
| | 11 | THE WITNESS:  Well, she has mentioned -- |
| | 12 | the child has mentioned to multiple people that mom |
| | 13 | may have taken a picture accidentally in the bathroom. |
| | 14 | She did not disclose that during the forensic |
| 10:58:17:10 | 15 | interview, but she has said that to Mikel Richert. |
| | 16 | She has indicated that to her siblings and who have |
| | 17 | then told Jeremy Buchanan, who is their father.  So |
| | 18 | other people have -- are aware of -- of the activity. |
| | 19 | It appears that she's been giving her |
| 10:58:38:09 | 20 | lavish gifts, trying to communicate with her in ways |
| | 21 | in which it's not supervised in order to control this |
| | 22 | particular child's narrative. |
| | 23 | THE COURT:  Anything else, Ms. Morrison? |
| | 24 | MS. MORRISON:  Just briefly, Your Honor. |
| | 25 | |

| | |
|---|---|
| 10:58:54:21 | 1   BY MS. MORRISON: |
| | 2       Q.     Investigator Evans, you mentioned that |
| | 3   the minor victim had been receiving lavish gifts from |
| | 4   the defendant during the ongoing course of the |
| 10:59:05:21 | 5   juvenile court case. When you say that they're |
| | 6   extravagant, are they extravagant in relation to |
| | 7   what's been given to the two other minor children? |
| | 8       A.     Yes, ma'am. |
| | 9       Q.     Could you be -- could you provide any |
| 10:59:21:00 | 10   specific examples of that? |
| | 11       A.     DCS advised of a Louis Vuitton bag that |
| | 12   may be a four or $500 bag. Additionally, the victim |
| | 13   was found to be in the possession of a few hundred |
| | 14   dollars that she'd indicated that her dad had given |
| 10:59:41:09 | 15   her, and he did not give her that money. We're still |
| | 16   unsure as to where that money came from, but... |
| | 17       MS. MORRISON: Your Honor, if you'd just |
| | 18   give me one minute, I believe I could be done. |
| | 19       I don't have any further questions. |
| 10:59:59:16 | 20   Thank you. |
| | 21       THE COURT: Mr. Evans, questions of this |
| | 22   witness? |
| | 23       MR. EVANS: Prior to questioning |
| | 24   Mr. Evans, I would -- I'll note for the Court that |
| 11:00:13:01 | 25   prior to the hearing Ms. Morrison provided me with |

11:00:15:19    1    several items of prior -- representing prior

               2    statements of, I believe, Officer Evans, that being

               3    the search warrants -- compromised of search warrants

               4    affidavits and then a -- the synopsis report related

11:00:36:06    5    to the investigation.

               6              I did want to -- I appreciate her doing

               7    that.  I did want to formally move for production of

               8    witness statements at this time to ensure that there

               9    are no other witness statements that exist or relevant

11:00:48:03   10    to this witness.

              11              MS. MORRISON:  And, Your Honor, I've

              12    produced all the statements that I'm aware of and that

              13    I have custody of.

              14              THE COURT:  All right, very good.

11:00:57:09   15              MR. EVANS:  Thank you.

              16                    **CROSS-EXAMINATION**

              17    BY MR. EVANS:

              18         Q.    Mr. Evans, do you go by agent, officer,

              19    detective?

11:01:04:04   20         A.    Investigator.

              21         Q.    Investigator, okay.  So maybe I'll just

              22    stick with Mr. Evans and we can -- we can go from

              23    there.  Just for clarity of the record, we're not

              24    related, are we?

11:01:17:15   25         A.    No, we are not.

| | | |
|---|---|---|
| 11:01:18:06 | 1 | Q. Okay. Just wanted to make sure. So -- |
| | 2 | at least not that we know of. |
| | 3 | So have you ever testified in relation to |
| | 4 | this case in front of anybody whatsoever? |
| 11:01:33:12 | 5 | A. No. |
| | 6 | Q. Never testified in front of a grand jury? |
| | 7 | A. No. |
| | 8 | Q. Okay. All right. So couple of things I |
| | 9 | want to go through. And I want to start back when |
| 11:01:47:00 | 10 | you're talking about the statements of the child in |
| | 11 | relation to these gifts. Have you personally |
| | 12 | interviewed this child? |
| | 13 | A. No, I have not. |
| | 14 | Q. The information that you just gave about |
| 11:01:57:19 | 15 | the bags, let's talk about lavish gifts. That |
| | 16 | information, where did that come from? |
| | 17 | A. That would be coming from DCS. |
| | 18 | Q. Okay. And then DCS doesn't have |
| | 19 | firsthand knowledge of the bag or who gave the bag; |
| 11:02:13:01 | 20 | fair to say? Right? |
| | 21 | A. Well, I'm not sure about that. |
| | 22 | Q. All right. So do you know where they |
| | 23 | even got the information from? |
| | 24 | A. I don't believe at this moment, I really |
| 11:02:25:20 | 25 | can't. |

11:02:26:04    1        Q.    Okay.  And you talked about your opinion

              2    being that my client poses some sort of a danger

              3    because she's trying to manipulate -- in your mind

              4    manipulate what this child might or might not say.  Is

11:02:40:15    5    that a fair summary of your earlier testimony in that

              6    regard?

              7        A.    That's what we're concerned about, yes.

              8        Q.    You're concerned about it, but you would

              9    agree with me that regardless of what court orders and

11:02:51:24   10    juvenile court may or may not have said, what you've

             11    testified to today is that my client is giving her

             12    gifts when she's not supposed to.  Fair enough?

             13        A.    Okay.

             14        Q.    All right.  You said a Louis Vuitton bag,

11:03:05:23   15    but isn't it more accurately, whether it matters or

             16    not, a Michael Kors bag, not a Louis Vuitton bag?

             17        A.    Could be.

             18        Q.    Could it be because you don't -- you're

             19    kind of spitballing, for lack of a better word, as to

11:03:19:13   20    some of this information, are you not?

             21        A.    Well, I'm not spitballing it.  That's

             22    what was told to me.

             23        Q.    Okay.  And you're familiar with the old

             24    concept of phone game; right?

11:03:31:01   25        A.    You'll have to explain.

11:03:32:16    1       Q.    As information gets passed from one

2    person to the next, it often changes; right?

3        A.    Okay.

4        Q.    And the more people it goes through, it

11:03:41:09    5    gets less reliable.  You'd agree with that?

6        A.    It's possible, yes.

7        Q.    All right.  So when you're talking about

8    these alleged infractions of juvenile court orders

9    from my client as it relates to contact with the

11:03:56:17    10    oldest child, Adelyn, you're getting that information

11    from DCS?

12        A.    Yes, sir.

13        Q.    Not sure where DCS is getting their

14    information; correct?

11:04:10:28    15        A.    Correct.

16        Q.    You talked a little bit about this fear,

17    we talked about that a while ago, this fear of why my

18    client is a danger trying to affect this child's

19    statement.  None of the interactions that you have,

11:04:28:06    20    not one of them, written interactions or -- that I

21    think you say are between my client and the child, do

22    they -- or none of them say -- or my client's

23    purportedly saying, hey, don't tell the cops this or

24    don't tell the cops that; right?

11:04:45:07    25        A.    No.  I think there was one -- one draft

| | |
|---|---|
| 11:04:49:29 | 1 |

email regarding the Fifth Amendment.

       2         Q.    Her constitutional rights?

       3         A.    Well, I think -- I can't remember exactly

       4  how that draft email came out.  But there was some

11:05:04:23     5  communication between the two about we've got to be

       6  careful, we've got to have a certain person on our

       7  side, that type of communication.

       8         Q.    Okay.  And, again, this is the school --

       9         A.    (simultaneous crosstalk).

11:05:23:10    10         Q.    Okay.  You've been made aware of these

     11  different areas of purported interactions with the

     12  child well before last week; correct?

     13         A.    Yes.

     14         Q.    You would agree with me that you have the

11:05:39:28    15  ability, the authority to immediately arrest Justis

     16  Johnson throughout this investigation.  You had the

     17  ability to go and immediately arrest her if you felt

     18  that her actions were endangering the safety of

     19  others?

11:05:58:26    20         A.    Well, I don't know that.  I know that we

     21  felt the child was -- we had hoped the child was in a

     22  safe environment.  The child has had to been moved

     23  from one person to the next, and we still had these

     24  unauthorized communication.

11:06:21:14    25         Q.    But my point is, are you testifying today

11:06:24:02    1    that as an officer of the law, in your role, that you

2    don't believe you had the ability to go out and arrest

3    her on state charges or some sort of criminal

4    complaint prior to any indictment being --

11:06:39:29    5         A.    I may have been able to do that, but we

6    chose -- we chose this method, especially since we had

7    to rebuild and relook at the devices that were

8    confiscated in this particular case because evidence

9    has been destroyed.  So that makes it much more

11:06:56:26   10    difficult for us when a subject has a head start and

11    knows we're coming.

12         Q.    Okay, so -- but let's back up.  Let's

13    talk about a head start.  I just want to make sure

14    because I want to talk about this concept of you

11:07:12:08   15    saying she's a danger.  Because you would agree with

16    me that Ms. Johnson has known about this investigation

17    at least since January 13 of 2021; right?

18         A.    Well, prior to that, but yes.

19         Q.    Okay.

11:07:28:19   20         A.    Prior to January.

21         Q.    All right.  Prior to that.  And but the

22    13th would have been the execution of the first search

23    warrant, I believe, if that's --

24         A.    Yeah, 13th, 14th, somewhere there.

11:07:39:16   25         Q.    Okay.  And you would agree with me you

| | |
|---|---|
| 11:07:42:00 | 1 |

knew where to find her when it came time to arrest her

2    on this charge; right?

3         A.     We had to look a little bit, but yeah, we

4    found her.

11:07:49:00    5         Q.     And you would agree with me that in

6    January, I think, of 2021 you received an email from

7    me stating I represented Ms. Johnson; correct?

8         A.     I may have.

9         Q.     Right.   And you passed that along to

11:08:05:12   10    Frank Dale who is the assistant US Attorney in the

11    Eastern District?

12         A.     Yes, sir.

13         Q.     And I at that time communicated to you

14    and Mr. Dale that I represented her and to contact me

11:08:17:21   15    if you needed anything; right?

16         A.     Yes.

17         Q.     And you never even had to call me and

18    say, hey, where's your client, did you?

19             MS. MORRISON:  Your Honor, I'm going to

11:08:25:29   20    object based on relevance.  I'm not sure how counsel

21    reaching out to the US Attorney's Office or the

22    investigator in question goes to the danger to the

23    community or risk of flight.

24             MR. EVANS:  It goes to the heart of risk

11:08:38:15   25    of flight.  This -- my client has known about this

11:08:41:10  1  thing since January of 2021 and has had a lawyer this

2  entire time saying, here I am, let's talk, reach out

3  to me if you need us.  That -- that's the heart of

4  risk of flight.  She's staying here and fighting this

11:08:57:05  5  proceeding.

6                THE COURT:  I think you made your point,

7  Mr. Evans.  I get it.

8                MR. EVANS:  Thank you.

9  BY MR. EVANS:

11:09:03:16  10       Q.   So at no time, just to be clear, no time

11  since January of 2021 based on all the information

12  you've had about potential danger for Ms. Johnson,

13  have you reached out and taken out a warrant for her

14  arrest prior to this indictment issuing; correct?

11:09:29:06  15       A.   Correct.

16       Q.   All right.  So let's go back and kind of

17  go through some of your earlier testimony.  So I want

18  to be clear.  You said there was two images,

19  essentially, that you became aware of that were at

11:09:47:24  20  issue; correct?

21       A.   Yes, sir.

22       Q.   And you said one of them had GPS

23  information and one of them did not?

24       A.   Yes.

11:09:54:27  25       Q.   All right.  And you have attributed those

| | |
|---|---|
| 11:09:59:07 | 1 being taken by my client, Ms. Johnson; correct? |
| | 2 A. Correct. |
| | 3 Q. And in all reality, you can't say with |
| | 4 any certainty -- you don't -- let me say it this way. |
| 11:10:13:03 | 5 You don't have any direct knowledge of who took those |
| | 6 photographs; is that correct? |
| | 7 A. We did not see her take those |
| | 8 photographs. |
| | 9 Q. Okay. So when you say she took the |
| 11:10:25:04 | 10 photographs, you're basing that on I think what you |
| | 11 said, your experience? |
| | 12 A. Well, among other things. We believed, |
| | 13 just going in, based on the communication, that it was |
| | 14 a female that was communicating within this chat room. |
| 11:10:42:12 | 15 That -- that is experience. But that doesn't |
| | 16 necessarily mean that's who it was. |
| | 17 But once we have examined these other |
| | 18 items and seen email confirmations of a Tor evil |
| | 19 browser purchase, websites on the dark web that we |
| 11:11:01:07 | 20 were able to recover and the corroborating |
| | 21 statements -- statements that Mr. Cavanaugh made that |
| | 22 we were able to corroborate with some examination, |
| | 23 then it is your client. |
| | 24 Q. Okay. And I understand you believe that, |
| 11:11:18:12 | 25 but let's talk about what you know. You know that |

| | | |
|---|---|---|
| 11:11:21:18 | 1 | Brandon Cavanaugh lived in that same address with |
| | 2 | Ms. Johnson; correct? |
| | 3 | A.    Correct. |
| | 4 | Q.    During that same period of time; right? |
| 11:11:28:10 | 5 | A.    Yes, sir. |
| | 6 | Q.    He had access to the same Internet |
| | 7 | devices as Ms. Johnson; correct? |
| | 8 | A.    Yes, possible. |
| | 9 | Q.    Possible.  He admitted to it during his |
| 11:11:43:09 | 10 | interview, did he not? |
| | 11 | A.    Well, he had access to devices that were |
| | 12 | in the house. |
| | 13 | Q.    There you go.  Okay.  And so he also had |
| | 14 | access to different passwords for different accounts |
| 11:11:57:01 | 15 | that she had; correct? |
| | 16 | A.    I don't know that. |
| | 17 | Q.    Don't know that, okay.  You said |
| | 18 | statistically, if I understood you correctly, that |
| | 19 | it's typically a male; right? |
| 11:12:11:11 | 20 | A.    Yes. |
| | 21 | Q.    And there was a male living at that house |
| | 22 | that was not related to Ms. Johnson's oldest daughter? |
| | 23 | A.    Correct. |
| | 24 | Q.    And who admitted to -- conveniently to |
| 11:12:22:22 | 25 | knowing about the image but not taking any part in the |

| | | |
|---|---|---|
| 11:12:25:15 | 1 | image; right? |
| | 2 | A.      Correct. |
| | 3 | Q.      And you would agree with me that he came |
| | 4 | in and met once he had a lawyer; right? |
| 11:12:35:19 | 5 | A.      Yes. |
| | 6 | Q.      Met with law enforcement.  Was that |
| | 7 | subject to a proffer agreement? |
| | 8 | A.      No. |
| | 9 | Q.      He was not promised anything, didn't sign |
| 11:12:47:17 | 10 | anything, you're being granted any type of immunity |
| | 11 | whatsoever during that interaction? |
| | 12 | A.      I don't think so, no. |
| | 13 | Q.      Okay.  Were you present for that |
| | 14 | interview? |
| 11:12:55:08 | 15 | A.      I was. |
| | 16 | Q.      Okay.  And oddly enough, the only thing |
| | 17 | that he admitted to doing was snapping pictures, |
| | 18 | screenshots of child pornography on his other device? |
| | 19 | A.      He admitted to taking a picture of the |
| 11:13:17:15 | 20 | images that were sent to him by Ms. Johnson.  And he |
| | 21 | admitted to assisting and taking that laptop and |
| | 22 | hiding it in the attic. |
| | 23 | Q.      Okay.  And purportedly is scared of |
| | 24 | Ms. Johnson retaliating against him? |
| 11:13:39:15 | 25 | A.      You cut out there. |

| | | |
|---|---|---|
| 11:13:40:24 | 1 | Q. He's -- purportedly he's scared of |
| | 2 | Ms. Johnson, physically scared of her? |
| | 3 | A. Yes, sir. |
| | 4 | Q. Were you made aware that this gentleman |
| 11:13:50:24 | 5 | remained in contact with Ms. Johnson past January 15 |
| | 6 | and beyond the date in which he would have met with |
| | 7 | law enforcement and told you he was scared? |
| | 8 | A. I haven't talked with him since then. |
| | 9 | Q. And was even texting back and forth with |
| 11:14:10:16 | 10 | Ms. Johnson? |
| | 11 | A. I don't know that. |
| | 12 | Q. And that -- if that were the case, that |
| | 13 | would definitely fly in the face of his claim that he |
| | 14 | was somehow scared, physically scared of Ms. Johnson? |
| 11:14:22:12 | 15 | A. Not necessarily. |
| | 16 | Q. Okay. So -- |
| | 17 | A. I could see -- I could see an individual |
| | 18 | reaching out trying to maintain some type of civil, |
| | 19 | cordial communication if they were -- if they |
| 11:14:38:01 | 20 | potentially felt in fear of somebody. I could see |
| | 21 | someone doing that and not just cutting off contact. |
| | 22 | Q. Okay. And continuing to want to be in |
| | 23 | the relationship with them and say how that they love |
| | 24 | them, things of that nature? |
| 11:14:54:19 | 25 | A. That would -- that would probably -- I |

11:14:58:10  1  don't think that's consistent, but I think -- I can't

2  speak to what somebody else is thinking when it comes

3  to that.

4       Q.    And I want to be clear about this

11:15:08:13  5  Exhibit 1 that was entered during your testimony.  Is

6  that the actual chat as it would have -- as it would

7  have populated in the chat room or is that some sort

8  of document, summary document that was created for the

9  purpose of testimony?

11:15:27:18  10       A.    Those were the communications involving

11  Female4CP, 2ndFemale4CP and 4thFemale4CP.  So that

12  would not include every communication of everyone in

13  that particular chat room.

14       Q.    And you can't say who -- you don't have

11:15:54:07  15  direct knowledge of who Female4CP is; correct?

16       A.    Not directly, no.

17       Q.    All right.  And that could just -- as far

18  as you know, that could just as soon be Brandon

19  Cavanaugh signing in under some type of a different

11:16:10:28  20  screen name, could it not?

21       A.    No, I don't think so.

22       Q.    You don't think so.  Do you have some

23  sort of -- based on all your training and experience,

24  do you have some sort of bias for Mr. Cavanaugh?

11:16:22:00  25       A.    No, I do not.  What I would say is is

11:16:24:24    1   that these pictures were taken on a -- at a time when

2   Mr. Cavanaugh was not in the home.

3        Q.    And how do you know that?

4        A.    Well, we have -- she told us that.  I

11:16:41:03    5   think Ms. Johnson made that statement, he was not here

6   during that time.  And she had made mention that there

7   may have been some other children at some point in the

8   home.  And so we did some interviews with DCS of other

9   children that had been at the house for some party,

11:17:04:20   10  and -- sometime prior to December.  I think it was

11  around Halloween they may have come over.

12        Q.    Okay.

13        THE COURT:  Wait a minute.  But were you

14  able to identify exactly when those pictures were

11:22:48:29  15  taken?

16        THE WITNESS:  I think the EXIF data on

17  that picture was 12-30-2021.

18        THE COURT:  And then did you corroborate

19  that that gentleman was not at the home at that time?

11:23:01:26  20        THE WITNESS:  Ms. Johnson stated that.

21  And he has stated that.  And his parents indicated he

22  was at their house putting together a bed --

23        THE COURT:  Okay.

24        THE WITNESS:  -- that he had ordered for

11:23:11:28  25  the father.

| | |
|---|---|
| 11:23:12:20 | 1 |

THE COURT: Okay. That's -- and that's the extent of your corroboration?

THE WITNESS: Yes.

THE COURT: Okay. Go ahead, Mr. Evans.

MR. EVANS: Thank you, Your Honor.

BY MR. EVANS:

Q. Did you ever -- you talked about some chats that indicated sexual contact with the minor victim. Did you personally interview the alleged victim, Ms. Johnson's oldest daughter, in relation to that?

A. I did not.

Q. Are you aware of a forensic interview taking place that you have reviewed?

A. Yes.

Q. And just to be clear, the minor child that's the subject of these pictures purportedly did not say she had ever been physically sexually abused; correct?

A. Correct.

Q. And during that interview she even said she had not been photographed?

A. During the initial -- during the initial forensic interview, yes.

Q. And --

11:24:21:27    1         A.    However, the next day following that

                        2   (indiscernible).

                        3         Q.    All right.  And then during that

                        4   interview -- and by the way, the search warrant -- the

11:24:29:19    5   children were removed on, what, January 13 during the

                        6   initial search warrant; correct?

                        7         A.    Yeah.  I keep thinking it's the 14th, but

                        8   you may be right.  I'm not really good with dates

                        9   sometimes.

11:24:41:24   10         Q.    Well, and, look, I may be misremembering

                     11   it as well as the 13th --

                     12         A.    They were removed that night, yes.

                     13         Q.    Okay.  And so the time she was

                     14   interviewed she was not in the mother's custody;

11:24:52:22   15   correct?

                     16         A.    No, she was not.

                     17         Q.    And during that interview she even said

                     18   that she had not -- she wasn't aware of any pictures

                     19   being taken of her when she was in any state of

11:25:02:23   20   undress; correct?

                     21         A.    That's what I remember, yes.

                     22         Q.    And the pictures that you have described

                     23   would indicate that the child being depicted would

                     24   have been aware of someone taking their picture;

11:25:20:24   25   correct?

11:25:21:09    1        A.    Definitely.

2        Q.    And then I think you stated at some point

3    that the child had said to somebody that her mother

4    may have accidentally taken pictures?

11:25:33:15    5        A.    Yes.

6        Q.    Is that -- was that part of a future

7    forensic interview or where did you get that

8    information?

9        A.    I believe that information came from

11:25:44:02    10    Jeremy Buchanan and Mikel Richert.

11        Q.    Okay.  Now, Jeremy Buchanan is

12    Ms. Johnson's ex-husband; correct?

13        A.    I believe so, yes.

14        Q.    And Mikel Richert is Ms. Johnson's

11:26:01:10    15    sister; correct?

16        A.    Correct.

17        Q.    And this indicates to you, at least, I

18    would imagine that those individuals were continuing

19    to talk to this child about these allegations outside

11:26:17:14    20    of the confines of those forensic interviews; right?

21        A.    No.  I -- it could be that.  Or it could

22    be the child was self-disclose -- was just disclosing.

23    And based on what I have been told by people that have

24    had custody of her, that the more stable the

11:26:41:20    25    environment, she settles down and she's able to

11:26:46:15   1   disclose and carry on a basically normal childhood.

2   It's when these interruptions occur and these

3   unauthorized communications occur, these secretive

4   communications that she acts out is my understanding.

11:27:06:13   5   Q.   And just to be clear, as of today as far

6   as you know, she is still visiting with Adelyn -- or

7   allowed under the order to visit with Adelyn, her

8   oldest child via Zoom; correct?

9   A.   Correct.

11:27:24:24   10   Q.   And you've made the Department of

11   Children's Services aware of these interactions to the

12   extent you know them?

13   A.   Yes.  And they've made us aware of

14   interactions that they become aware of.

11:27:37:06   15   Q.   Okay.  And she's -- and Ms. Johnson

16   continues to enjoy in-person visits with her youngest

17   two children supervised weekly; is that correct?

18   A.   Correct.  I believe at this Ames Brown's

19   residence.

11:27:58:09   20   Q.   Just so we're clear, all of this --

21   these -- these infractions, as you call them, of the

22   juvenile court order, those have been known to DCS

23   prior to today; right?

24   A.   Some of them, yes.  I can't say that they

11:28:13:27   25   know of all.  I don't know that there's any more than

| | | |
|---|---|---|
| 11:28:17:03 | 1 | they know of, but what they know of, yes. |
| | 2 | Q. Okay. Now, talking about Mr. Cavanaugh, |
| | 3 | Mr. Cavanaugh, you talked about, admittedly lied to |
| | 4 | you guys originally; correct? |
| 11:29:30:25 | 5 | A. Correct. |
| | 6 | Q. And if I understand it, he's the one who |
| | 7 | told you where the laptop was that contained the child |
| | 8 | pornography? |
| | 9 | A. Correct. |
| 11:29:47:04 | 10 | Q. And he even went into -- according to |
| | 11 | him, back into the house where -- this hiding spot in |
| | 12 | the rafters and handled the laptop right before you |
| | 13 | issued your search warrant to make sure it was still |
| | 14 | there? |
| 11:30:06:25 | 15 | A. I don't know that -- |
| | 16 | Q. And -- |
| | 17 | MS. MORRISON: Your Honor, I'd ask that |
| | 18 | counsel let the witness finish answering so we have a |
| | 19 | clear record. |
| 11:30:18:26 | 20 | THE COURT: Yeah, I think that's what he |
| | 21 | was doing. Investigator, you can finish answering |
| | 22 | your -- that question. |
| | 23 | THE WITNESS: I don't know that -- thank |
| | 24 | you, Judge. I don't know that. I believe, if my |
| 11:30:29:17 | 25 | memory serves, that Mr. Cavanaugh had mentioned going |

11:30:33:12   1   back to check on that, and I believe I told him not to

2   do that, let's just -- let us apply for the warrant

3   and go try to find it.  If it's there, it's there.  If

4   it's not, it's not.  And that's -- that's my

11:30:50:03   5   recollection.

6   BY MR. EVANS:

7        Q.    But if one of your reports or

8   applications indicates that he did that anyway, you

9   wouldn't have any -- you wouldn't dispute that?

11:31:05:05  10        A.    No, I wouldn't dispute it.  It just would

11   not be my ordinary practice to ask him to do that.

12        Q.    Now, you testified that there's no

13   indication that Mr. Cavanaugh used that particular

14   laptop.  Do you remember saying that?

11:31:27:19  15        A.    I don't think I said that he didn't use

16   it.  I think that I indicated he's not the primary

17   user of that laptop.  There is some information on

18   there that pertains to Mr. Cavanaugh, but it does not

19   appear that he is the primary user.

11:31:43:21  20              That computer was reset, and the folder

21   structure that we have recovered indicates that that

22   computer, prior to January the 15th, was under the

23   user Justi, J-u-s-t-i, was the primary user of that

24   computer before Windows was reinstalled.

11:32:08:22  25        Q.    And you just mean that that's the -- the

| | |
|---|---|
| 11:32:10:25 | 1 |

overall user, when you log in, that's the user, like
you go into a Windows computer, it just says --

    A.    I would have to go back and check, but I
believe that is the computer name and user.  I'd have
to go back and look at that.  We've got that
information, I just don't have it -- I can't recall
it.

    Q.    All right.  And just to be clear,
Mr. Cavanaugh is not named in either of the counts of
the indictment related to the production or
distribution of child pornography?

    A.    He is not.

    Q.    How convenient.  And then he's -- but he
is named in Count Three for the concealed and/or
destruction of evidence; correct?

    A.    Correct.

    Q.    And because this laptop that we're
talking about that was hidden, is that the one that
you said they took or he claimed they took to
McDonald's and he helped erase or reset?

    A.    I don't know if they took that laptop to
the McDonald's.  It indicated to me, if I remember
correctly, that it had connected to that McDonald's
wi-fi.  I could be incorrect.  I could be thinking of
another device that connected, but in either event,

| | | |
|---|---|---|
| 11:33:34:16 | 1 | they took a device and I believe it to be his iPad, at |
| | 2 | least his iPad from Serve Pro to the McDonald's to |
| | 3 | access the Internet and access and destroy some online |
| | 4 | accounts.  And there was some searches recovered from |
| 11:33:53:10 | 5 | I think maybe the phone and possibly the laptop |
| | 6 | regarding what do I do when I lose access to my iCloud |
| | 7 | account, how to delete my iCloud account, those type |
| | 8 | of searches. |
| | 9 | Q.    And I want to make sure I caught what you |
| 11:34:13:03 | 10 | just said.  So Mr. Cavanaugh's actual -- his iPad was |
| | 11 | erased; correct? |
| | 12 | A.    No, I don't think so. |
| | 13 | Q.    I thought you said -- I may have |
| | 14 | misunderstood you.  There was an iPad for |
| 11:34:28:13 | 15 | Mr. Cavanaugh? |
| | 16 | A.    Correct.  So I think that iPad was his |
| | 17 | work iPad.  So he had indicated that Ms. Johnson told |
| | 18 | him, we are going to go to Serve Pro, get your iPad |
| | 19 | and then delete online accounts.  We took, I think, |
| 11:34:46:20 | 20 | just about every device they had except for that |
| | 21 | laptop that had been hidden.  So there was no other |
| | 22 | way, I think, for them at that time to connect to the |
| | 23 | Internet. |
| | 24 | Q.    Okay.  But that iPad -- I just want to |
| 11:35:01:00 | 25 | talk about it just to make sure I understand it right. |

11:35:03:21    1    This iPad for Mr. Cavanaugh, he admitted to erasing

2    online accounts from his iPad?

3         A.    He didn't admit that.  He said she

4    utilized that.

11:35:15:03    5         Q.    Oh, so she -- okay.  So she was utilizing

6    his iPad --

7         A.    They went together to Serve Pro and

8    gathered that iPad.

9         Q.    Okay.  Mr. Cavanaugh purportedly had

11:37:42:25   10    nothing -- nothing whatsoever to hide.  He engaged in

11    just helping conceal this evidence on these iPads and

12    various devices; right?

13         A.    He knew about it.

14              MR. EVANS:  One moment, Your Honor.

11:37:59:08   15    BY MR. EVANS:

16         Q.    You would agree with me Mr. Cavanaugh has

17    already received a benefit in exchange for the

18    information that he provided to law enforcement;

19    right?

11:38:39:13   20              MS. MORRISON:  Your Honor, I'm going to

21    object.  I'm not sure how this goes to dangerousness

22    or risk of flight as to Ms. Johnson.

23              THE COURT:  What do you say, Mr. Evans?

24              MR. EVANS:  Your Honor, this is me

11:38:50:05   25    wrapping up, but it goes to that because they're

| | | |
|---|---|---|
| 11:38:53:00 | 1 | asking this Court to rely on the credibility of |
| | 2 | information relayed to law enforcement by |
| | 3 | Mr. Cavanaugh.  And with his credibility in question, |
| | 4 | I think it's very relevant and this Court needs to be |
| 11:39:07:13 | 5 | able to properly evaluate that credibility by knowing |
| | 6 | what exactly he had at stake and what benefits he -- |
| | 7 | you know, biases he may have had not to be honest with |
| | 8 | them. |
| | 9 | THE COURT:  I'll overrule the objection. |
| 11:39:22:20 | 10 | You can answer that question.  I think that will be |
| | 11 | the end of it. |
| | 12 | THE WITNESS:  Could you ask that question |
| | 13 | again, please? |
| | 14 | BY MR. EVANS: |
| 11:39:30:07 | 15 | Q.    Sure.  Would you agree with me that |
| | 16 | Mr. Cavanaugh has already received a benefit of the |
| | 17 | government in regard to his coming in and speaking |
| | 18 | and, quote/unquote, cooperating? |
| | 19 | A.    I'm not going to agree with that.  He was |
| 11:39:44:00 | 20 | charged.  He's been charged.  Now, he hasn't been |
| | 21 | charged with the same offenses that Ms. Johnson, but |
| | 22 | he's been charged. |
| | 23 | Q.    He hadn't been charged with production of |
| | 24 | child pornography; right? |
| 11:39:56:18 | 25 | A.    Correct. |

11:39:57:21    1          Q.    Or aiding and abetting it; correct?

               2          A.    Correct.

               3          Q.    Hadn't been charged with distribution of

               4    child pornography; correct?

11:40:04:17    5          A.    Correct.

               6          Q.    Or aiding and abetting it?

               7          A.    Correct.

               8          Q.    Or any kind of conspiracy to do either

               9    one; correct?

11:40:13:06   10          A.    Correct.

              11                MR. EVANS:  Those are my questions.

              12                THE COURT:  I need to ask a couple

              13    questions, Investigator.  The document that was

              14    entered at -- the Government's Exhibit No. 1, which is

11:40:23:18   15    the contents or portion of the contents of the chat,

              16    you-all had that prior to the execution of the search

              17    warrant in early January 2015; right (sic)?

              18                THE WITNESS:  Yes, sir.

              19                THE COURT:  And when was it that you

11:40:36:29   20    executed the second search warrant that resulted in

              21    getting that second -- that other laptop?

              22                THE WITNESS:  That might have been a week

              23    and a half later.

              24                THE COURT:  Okay.  So we're still talking

11:40:49:19   25    about January 2021; right?

11:40:52:00   1                    THE WITNESS:  Yes, sir.

2                    THE COURT:  And then in terms of the

3        analysis of that computer and the downloads, when

4        did -- you testified about some of the contents that

11:41:01:20   5        was on that computer.  When did you receive that

6        information?

7                    THE WITNESS:  That's still been ongoing.

8                    THE COURT:  Well, you testified that one

9        of the things you found on there was some child

11:41:12:26  10        pornography.  When did you find that?

11                    THE WITNESS:  I'd say that'd be about six

12        months out.

13                    THE COURT:  Okay.  All right.  So you

14        think June of 2021 is when you had that?

11:41:23:09  15                    THE WITNESS:  Yes.

16                    THE COURT:  Okay.  And what evidence have

17        you recovered from the laptops or other physical

18        evidence related to Counts One and Two of this

19        indictment since June of 2021?

11:41:47:20  20                    THE WITNESS:  Since June of 2021,

21        probably nothing else related to those two counts.

22                    THE COURT:  Okay.  All right.  Thank you.

23                    Ms. Morrison, any redirect?

24                    MS. MORRISON:  Just briefly, Your Honor.

25

| | |
|---|---|
| 11:41:57:24 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:42:06:12 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:42:19:18 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 11:42:25:19 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 11:42:50:06 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 11:43:07:05 | 25 |

**REDIRECT EXAMINATION**

BY MS. MORRISON:

Q.    Investigator Evans, you testified about some disclosures that the minor victim made about the defendant perhaps inadvertently photographing her. Did the minor victim make any statements about Mr. Cavanaugh being involved in the production of those photographs?

A.    No, ma'am.

THE COURT:  Well, not that you're aware of; right?

THE WITNESS:  No, sir.

THE COURT:  Okay.  Go ahead, Ms. Morrison.

BY MS. MORRISON:

Q.    Investigator Evans, based on your contact with DCS and other individuals connected to this case, do you expect that if any such disclosures had taken place, you would have been notified of them?

A.    Yes, ma'am.

Q.    Do you have any information during the course of your investigation that suggests that Mr. Cavanaugh played any role in the production or distribution of these images?

A.    No, not in the production.  He became

| | | |
|---|---|---|
| 11:43:09:11 | 1 | aware of it, though, after the fact. |
| | 2 | Q.    Any suggestion from the forensic |
| | 3 | examinations that he was downloading child |
| | 4 | pornography? |
| 11:43:20:07 | 5 | A.    No. |
| | 6 | MS. MORRISON:  I don't have any further |
| | 7 | questions, Your Honor. |
| | 8 | THE COURT:  All right.  Thank you, |
| | 9 | Investigator Evans.  Appreciate your testimony. |
| 11:43:27:13 | 10 | You're free to stay if you'd like, but you can leave |
| | 11 | if you need to take care of other matters. |
| | 12 | *****WITNESS EXCUSED***** |
| | 13 | THE COURT:  Ms. Morrison, do you have any |
| | 14 | other proof you want to put on? |
| 11:43:39:14 | 15 | MS. MORRISON:  No, Your Honor. |
| | 16 | THE COURT:  Mr. Evans, you have any |
| | 17 | rebuttal evidence you want to put on? |
| | 18 | MR. EVANS:  No, Your Honor. |
| | 19 | THE COURT:  All right.  Y'all wish to be |
| 11:43:46:05 | 20 | heard? |
| | 21 | MR. EVANS:  Yes, Your Honor. |
| | 22 | THE COURT:  Ms. Morrison, does the |
| | 23 | government want to be heard? |
| | 24 | MS. MORRISON:  Yes, Your Honor. |
| 11:43:53:09 | 25 | THE COURT:  All right.  I'll hear from |

11:43:54:17    1    you first.

2    MS. MORRISON:  Your Honor, obviously the

3    Court's already found that the defense rebutted the

4    presumption, but I think it's clear from the testimony

11:45:03:24    5    while the defendant may not be a flight risk, there's

6    no suggestion that she's fled the area, I would remind

7    the Court that if she's convicted of Count One, she

8    faces a mandatory minimum sentence of 15 years and the

9    possibility of up to a life sentence.  And the

11:45:20:01    10    requirement of Sex Offender Registry would obviously

11    have tremendous impact on her life.

12    I think there is a question about danger

13    to the community and specifically danger to this

14    particular victim.  The Court's heard testimony that

11:45:38:22    15    there is an order in place with this particular minor

16    victim.  That order has been violated.  For whatever

17    reason the visitation has been continued.  Although, I

18    would proffer to the Court, there's some suggestion

19    that at certain points in time there was movement to

11:45:55:05    20    curtail that visitation or limit it or even stop it.

21    But clearly as recently as April the defendant was

22    allowed to have Zoom visitation the minor victim.

23    But it's concerning that in spite of the

24    fact that the defendant knew the investigation was

11:46:12:08    25    ongoing, hired counsel, there was an ongoing juvenile

11:46:16:24    1    court case, she continued to violate the court order,

2    which suggests to me that even if this Court orders

3    conditions, she's not likely to follow them.

4              It's troubling, certainly, in the content

11:46:29:10    5    of the Exhibit 1 which is the -- you know, the

6    statements we believe the defendant made within this

7    chat room in connection with the publication of these

8    particular images.  There's reference to sexual

9    contact with the minor victim.  There's reference to

11:46:45:22   10    offering her minor son up for a sexual act and being

11    willing to hold him down.  And those kinds of

12    statements are obviously very troubling.

13              We've heard testimony from Ms. McGee and

14    we have the Pretrial Services Report that indicates

11:47:00:25   15    that the defendant does online work.  Ms. McGee does

16    online work, and so I don't know that the Court could

17    reasonably craft conditions that could ensure that she

18    doesn't have any connection to the Internet, which was

19    obviously one of the means that she used to facilitate

11:47:17:12   20    this crime.

21              I'd ask the Court not to release her.  I

22    don't believe that there are conditions upon which she

23    can be safely released.  I can't speak to the delay

24    between the time of the execution of the search

11:47:27:17   25    warrants and indictment.  Certainly it's not my case.

11:47:30:15　1　You know, I understand we typically proceed in

2　different manners in this district, but I can't speak

3　to that.  I don't know.

4　　　　　　　Obviously there's been some delays

11:47:39:24　5　because of the deletion of the evidence and trying to

6　recover it.  But certainly in a case where we have

7　numerous devices that are being examined, delay is not

8　necessarily unexpected.  So I'd ask the Court to

9　detain the defendant.

11:47:54:29　10　　　　　　　THE COURT:  All right.  Thank you,

11　Ms. Morrison.

12　　　　　　　Mr. Evans, I'll hear from you.

13　　　　　　　MR. EVANS:  Thank you, Your Honor.

14　　　　　　　It would be the defendant's position in

11:48:04:28　15　this case that there is not clear and convincing

16　evidence that she poses a danger to the community.  I

17　think the government's conceded that she is not a

18　flight risk at this time, so I won't address that

19　issue.

11:48:16:03　20　　　　　　　But I will address this on dangerousness.

21　First and foremost, the government had the discretion

22　from day one to pick her up and put her in custody.

23　January 13, 2021.  They knew of these chats that they

24　purport to be her chats at that time.  They knew of

11:48:41:12　25　these images that they purport she took and uploaded

| | | |
|---|---|---|
| 11:48:44:10 | 1 | at that time.  They had every -- all the discretion in |
| | 2 | the world to charge her either in state court or |
| | 3 | federal court, affidavit of complaint, criminal |
| | 4 | complaint, and argue at that time she was a danger. |
| 11:48:57:18 | 5 | For them to come in at this late date and |
| | 6 | say that those facts are a basis for danger in and of |
| | 7 | themselves is absurd.  Because they themselves didn't |
| | 8 | believe it.  Had they believed her to be a danger |
| | 9 | then, they would have acted then.  There is no |
| 11:49:20:24 | 10 | question. |
| | 11 | I don't believe for a minute that the |
| | 12 | federal government and its agents, through Task Force |
| | 13 | or otherwise, would have allowed someone that they |
| | 14 | believed to be a danger to remain uncharged and out of |
| 11:49:34:22 | 15 | custody.  So by their own actions I believe that they |
| | 16 | should be estopped, essentially, from arguing danger |
| | 17 | based on those facts here today. |
| | 18 | Now, the additional fact argued by |
| | 19 | Ms. Morrison today with dangerous -- kind of |
| 11:49:52:23 | 20 | dangerousness and this kind of risk of flight that she |
| | 21 | put on at the end was now she knows she's facing a |
| | 22 | 15-year mandatory minimum and that would be some |
| | 23 | incentive to act in some -- in any certain way.  What |
| | 24 | the proof has shown today is that she's had counsel |
| 11:50:10:06 | 25 | since January of '21, has been present for court -- |

| | | |
|---|---|---|
| 11:50:17:00 | 1 | many court proceedings in juvenile court in Davidson |
| | 2 | County -- or, excuse me, in Knox County, rather, has |
| | 3 | engaged in that process, has defended herself in that |
| | 4 | process, was available to federal law enforcement as |
| 11:50:32:11 | 5 | well. |
| | 6 | And this Court can be assured that based |
| | 7 | on the nature of the allegations of this case that she |
| | 8 | was -- she's been aware of the mandatory minimum |
| | 9 | potential punishment for production of child |
| 11:50:46:28 | 10 | pornography for an extended period of time because |
| | 11 | (indiscernible). |
| | 12 | So this idea that that's a new |
| | 13 | development as of today is -- again, should not be |
| | 14 | credited by this Court. And this Court can fashion |
| 11:51:03:00 | 15 | conditions of release that can reasonably assure the |
| | 16 | safety of the community and reappearance in court. |
| | 17 | Before I go into talking about |
| | 18 | conditions, I want to say this: As it relates to |
| | 19 | dangerousness, the juvenile court order has been in |
| 11:51:27:06 | 20 | place this entire time. Any alleged violations or |
| | 21 | failure to abide by that court order could have been |
| | 22 | pursued in that court for contempt or otherwise and it |
| | 23 | has not. They have attempted to modify those |
| | 24 | conditions, and those conditions of contact with the |
| 11:51:47:16 | 25 | children have been modified over time, which |

11:51:49:19  1   Your Honor has heard testimony now result in Zoom-only
            2   contact with the oldest child, Adelyn, with the mother
            3   that is supervised and continued supervised weekly
            4   contact with the two minor children that is
11:52:07:25  5   supervised.
            6           And, again, if there was a concern of
            7   danger to this child, that court, who is
            8   specifically -- specifically has the mandate to
            9   protect children, would have done so further and they
11:52:31:15 10   have not. So I think this Court can fashion an order
           11   as it relates to that and say that contact ongoing
           12   with the children will be subject to or pursuant to
           13   any juvenile court orders. And that will reasonably
           14   assure the safety of the community and specifically
11:52:53:26 15   the children in this case.
           16           Your Honor, as it relates to some of this
           17   information on strength of the evidence, I do want to
           18   briefly talk about that. One thing that is
           19   particularly telling about this case is the government
11:53:10:06 20   has, I think, somewhat conveniently chosen Ms. Johnson
           21   to be the culprit in this case without any forensic
           22   evidence that directly links her to it when there was
           23   a male in the house unrelated to this child that had
           24   equal access to these digital devices and to this
11:53:33:10 25   child. And they have, for whatever reason, gone

11:53:37:29    1    against all the statistical information and the

2    experience that Mr. Evans has in this regard.  They

3    (indiscernible) it's all in its face and on its ear

4    and decided that for some reason Mr. Cavanaugh didn't

11:53:51:20    5    have anything to do with any of it except for the

6    destruction of this evidence.

7        But why in the world would he describe

8    evidence that he had no hand in making?  Why would he

9    snap pictures of child pornography on his device to

11:54:04:17    10    somehow have a record because he was concerned for

11    these children when there's no indication that he took

12    any steps to report this conduct to law enforcement?

13        So I think the Court, when it's

14    evaluating the strength of the evidence as it relates

11:54:21:18    15    to dangerousness -- and I understand that's the

16    obligation of the Court at this -- when it's

17    evaluating the strength of the evidence, it is a

18    situation where I think the Court can take that into

19    consideration.

11:54:35:28    20        Now, the Court has heard from Ms. Biane

21    McGee.  Your Honor, it's our position that she is an

22    appropriate third-party custodian.  She has testified

23    that -- that Ms. Johnson can either live with her at

24    her residence or Ms. Johnson can live at the residence

11:54:53:25    25    that she owns, the condo that she owns.  One of two

|            |     |                                                              |
|------------|-----|--------------------------------------------------------------|
| 11:54:58:12 | 1  | things can happen.  And this Court can put down any --        |
|            | 2  | and we are happy for the Court to put any restrictions        |
|            | 3  | whatsoever that the Court deems appropriate.  The             |
|            | 4  | Court can do ankle monitoring to make sure that the --        |
| 11:55:11:19 | 5  | that Ms. Johnson's whereabouts are always known by            |
|            | 6  | Pretrial Services.  This Court can do house arrest or         |
|            | 7  | any version of curfew that it deems appropriate.              |
|            | 8  | As it relates to digital devices, this                       |
|            | 9  | Court can either, A, order that she not be allowed            |
| 11:55:26:18 | 10 | access to any digital devices.  And if she stays in           |
|            | 11 | this condominium that is six miles from Ms. Biane            |
|            | 12 | McGee's house, Ms. McGee has indicated that she can --        |
|            | 13 | that there would be no Internet access to that house.        |
|            | 14 | And the Court can order that she not have access to           |
| 11:55:45:26 | 15 | digital devices, period.                                      |
|            | 16 | Contrarily to that or in the alternative,                    |
|            | 17 | rather, this Court can also fashion an order that             |
|            | 18 | allows Ms. Johnson access to digital devices under            |
|            | 19 | restrictions.  She can use a digital device and have          |
| 11:56:08:09 | 20 | Internet access as it relates to her work.  And the           |
|            | 21 | Court can do that, that she can only use it for work          |
|            | 22 | purposes.                                                     |
|            | 23 | There's been no proof before this Court                      |
|            | 24 | that there's been any continued -- alleged continued         |
| 11:56:25:00 | 25 | interaction with child pornography or dark web or any        |

| | | |
|---|---|---|
| 11:56:28:10 | 1 | of those things since the January 13 -- or January 13, |
| | 2 | 2021, search warrant and the preceding search warrant. |
| | 3 | This Court could also -- it's my |
| | 4 | understanding that Pretrial Services has the ability |
| 11:56:45:18 | 5 | to put on a monitoring device, a monitoring device on |
| | 6 | a computer, if she has access to it, that will |
| | 7 | basically keystroke everything that she does to where |
| | 8 | they can actively monitor what everything that she |
| | 9 | does on that device. And I know that my client would |
| 11:57:04:20 | 10 | be more than happy to have any software of the like |
| | 11 | placed on any device she has. I would ask that the |
| | 12 | Court allow her to have limited access. |
| | 13 | I can tell you this: The government |
| | 14 | wasn't all that concerned about her access to digital |
| 11:57:21:15 | 15 | devices and the Internet between January of '21 and |
| | 16 | today or the date of the motion to detain because they |
| | 17 | allowed her out without any oversight whatsoever, with |
| | 18 | unbridled access to digital devices and the Internet. |
| | 19 | Again, I think they should ultimately be almost |
| 11:57:44:04 | 20 | estopped from making that argument today. |
| | 21 | So I would ask the Court to put whatever |
| | 22 | conditions it sees fit, because there is a condition |
| | 23 | or combination of conditions that can reasonably |
| | 24 | assure this Court that she is not a flight risk and |
| 11:57:58:09 | 25 | she is not a danger. We'd ask the Court to release |

11:58:01:29    1    her to Ms. Biane McGee under any conditions that the

2    Court sees fit that are necessary to assure the Court

3    that those two items are sufficiently covered for this

4    Court. Thank you.

11:58:20:25    5                THE COURT: All right, thank you.

6                Ms. Morrison, I'll give you the last word

7    if you want it.

8                MS. MORRISON: Yes, Your Honor.

9                I find it interesting that defense

11:58:28:19    10    counsel is arguing that we should have charged

11    Mr. Cavanaugh. The government has an ethical

12    obligation to charge only those individuals we believe

13    actually commit crimes, and Mr. Cavanaugh has been

14    charged with crimes we believe he committed.

11:58:42:28    15                There is no indication that he was at the

16    residence when these images were created, and that's

17    been by the statements of the defendant herself,

18    Mr. Cavanaugh's family members, other children who

19    were at the residence and the absence of any

11:58:58:18    20    disclosures by the minor victim herself.

21                Investigator Evans testified that there

22    were no indications that the defendant was accessing

23    images of child pornography on his devices. In fact,

24    the only two images that were found were the two that

11:59:13:18    25    he said he Snapchated. So I think we took the right

11:59:18:07  1   actions in this case by not charging this individual.

2   I don't think there are conditions that

3   this defendant can be released on.  Certainly the

4   Court can consider her lack of compliance with the

11:59:27:27  5   juvenile court orders in determining whether or not

6   she can be safely released on conditions and whether

7   or not she'll comply with conditions.  And her past

8   history suggests that she won't.

9   THE COURT:  Thank you.

11:59:40:13  10  All right.  First of all, I want to thank

11  the lawyers.  I appreciate your efforts in this case.

12  Good advocacy is important to the Court and helpful in

13  reaching difficult decisions that the Court has to

14  make on these issues.

11:59:53:21  15  Secondly, I want to take just a minute to

16  thank Ms. McGee for being here today, for her

17  testimony and for her willingness to serve as

18  third-party custodian to assist the Court in this

19  case.  The Court also acknowledges the receipt of the

12:00:08:15  20  numerous letters and other materials that Mr. Evans

21  filed with the Court.  I've reviewed those prior to

22  the hearing and I'm aware of the contents of those.

23  And I want to point out that, as I often

24  do when I see this, that there are a lot of people who

12:00:25:14  25  come before this Court who don't have anybody that's

12:00:27:19  1  willing to support them and stand behind them and be

2  there for them.  So the Court acknowledges this and

3  gives it appropriate weight in this particular

4  instance.  And I also specifically want to thank

12:00:40:21  5  Ms. McGee for her presence and willingness to serve

6  and testify to be here.  It does mean a lot to me, and

7  I just want you to know that I appreciate you doing

8  that.

9  The Bail Reform Act ordinarily requires

12:00:52:25  10  that a defendant be released pending trial unless

11  there are no conditions that will reasonably assure

12  the appearance of the person at future court

13  proceedings and the safety of the community.

14  The Court has to consider a number of

12:01:02:29  15  factors, including the nature and circumstances of the

16  offense charged, the weight of the evidence against

17  the defendant, history and characteristics of the

18  defendant, and the nature and seriousness of the

19  danger posed by the defendant's release.

12:01:13:15  20  This default rule of release pending

21  trial is reversed and detention's presumed for certain

22  defendants accused of specific offenses such as are

23  present in this particular case.  This imposes a

24  burden of production on the defendant to offer at

12:01:27:16  25  least some evidence that he or she does not pose a

| | | |
|---|---|---|
| 12:01:30:14 | 1 | risk of danger to the community or risk of flight. |
| | 2 | The Court even when finding, as I have in this case, |
| | 3 | that that slight burden of production is met, the |
| | 4 | Court must nonetheless give some weight to the |
| 12:01:42:09 | 5 | presumption of detention because it reflects the |
| | 6 | judgment of Congress that particular classes of |
| | 7 | offenders should ordinarily be detained prior to |
| | 8 | trial. |
| | 9 | The Court is mindful of the fact that in |
| 12:01:52:11 | 10 | our society liberty is the norm and detention prior to |
| | 11 | trial or without trial is the carefully limited |
| | 12 | exception.  And I'm also mindful of the tension |
| | 13 | between the Bail Reform Act and the presumption of |
| | 14 | innocence that applies to Ms. Johnson and all |
| 12:02:05:22 | 15 | individuals accused of offenses that come before the |
| | 16 | Court. |
| | 17 | As I noted, I did find that the defendant |
| | 18 | has met her burden of production with regard to the |
| | 19 | presumption and I will, nonetheless, give it the |
| 12:02:19:15 | 20 | appropriate weight that -- as I'm required to do in |
| | 21 | this particular circumstance and all cases in which |
| | 22 | the presumption applies and is met. |
| | 23 | In terms of the evidence in this case, |
| | 24 | I've heard the proof and am ready to rule. |
| 12:02:38:00 | 25 | Considering the issue of risk of flight in this |

12:02:40:18    1    particular situation, I find it to be compelling

2    evidence that Ms. Johnson has been aware of the

3    potential of these charges, has had retained counsel

4    representing her in this matter since January of 2021.

12:02:55:11    5    This has been a significant period of time.  I would

6    certainly expect Mr. Evans or any other criminal

7    defense lawyer to advise their client of potential

8    charges and potential sanctions and penalties if they

9    were to be convicted.

12:03:10:12    10    And so I think that it's significant as

11    to the issue of flight that Ms. Johnson has remained

12    present, has participated in the juvenile court

13    proceedings, has communicated to the US Attorney's

14    Office in the Eastern District through her counsel and

12:03:28:12    15    has generally been available and around and has not

16    apparently made any efforts at flight during this

17    particular time.

18    Likewise, I accept the representation

19    that there have been numerous proceedings in the

12:03:42:00    20    juvenile court matter and that she has appeared for

21    those matters, suggesting that she doesn't create a

22    serious or significant risk of nonappearance.

23    The Court does accept and acknowledge

24    that things are different now that she has been

12:03:57:00    25    charged with a real live federal indictment issued by

| | | |
|---|---|---|
| 12:04:00:24 | 1 | a grand jury, and that is significant.  As |
| | 2 | Ms. Morrison notes, there is a reality to that that |
| | 3 | now comes into play that, based upon the actual |
| | 4 | charges to have been brought, she does face a |
| 12:04:12:15 | 5 | potential mandatory minimum sentence, as well as a |
| | 6 | significant lengthy sentence and also a term of |
| | 7 | community supervision once she is released that would |
| | 8 | also be onerous and significant. |
| | 9 | So to the extent that there is any |
| 12:04:28:11 | 10 | appropriate weight to give this as it relates to the |
| | 11 | issue of potential flight, the Court is satisfied that |
| | 12 | there are conditions of release that would reasonably |
| | 13 | assure her appearance at future court proceedings, |
| | 14 | namely, as Mr. Evans suggests, the utilization of the |
| 12:04:43:23 | 15 | third-party custodian, location monitoring and the |
| | 16 | like. |
| | 17 | And I think that those -- those |
| | 18 | conditions, given the historical record that I've |
| | 19 | identified, are sufficient to reasonably assure her |
| 12:04:59:09 | 20 | appearance at future court proceedings and that she |
| | 21 | would not flee the jurisdiction to avoid prosecution. |
| | 22 | So I think that -- that issue can be dealt with |
| | 23 | through conditions. |
| | 24 | The more difficult issue in this case |
| 12:05:11:18 | 25 | relates to the issue of danger to the community.  And |

12:05:15:25  1   in this particular circumstance, there's no question

2   that offenses that involve child pornography and, more

3   importantly, the production of child pornography are

4   serious and significant offenses.  They relate to the

12:05:30:09  5   most vulnerable or among the most vulnerable of our

6   community and our society and individuals that deserve

7   and need the production of the law and of the courts

8   in this particular circumstance.

9        The nature of the allegations in this

12:05:47:20  10  case and the nature of the circumstances surrounding

11  this charge are significant and serious.  But that's

12  not the only condition that the Court has to consider,

13  obviously.  Considering the weight of the evidence

14  against the defendant, it's important to note that

12:06:02:15  15  this goes to the weight of the evidence of

16  dangerousness as opposed to the weight of the evidence

17  of the defendant's guilt as to a particular charge

18  she's facing.

19       With respect to the history and

12:06:13:14  20  characteristics of this defendant, the Court's

21  reviewed the bond report in this case and specifically

22  notes the absence of any prior criminal convictions.

23  It appears that she has ties to the community.  She

24  has long-standing ties as evidenced by the number of

12:06:30:05  25  letters that the Court received.  There are a number

|  |  |  |
|---|---|---|
| 12:06:32:12 | 1 | of people who are out there in the community who |
|  | 2 | support her and are willing to stand with her.  She's |
|  | 3 | also maintained employment.  And otherwise the history |
|  | 4 | and characteristics of her situation certainly do not |
| 12:06:49:02 | 5 | weigh in favor of detention. |
|  | 6 | But the Court has to also consider the |
|  | 7 | nature and seriousness of the danger posed by the |
|  | 8 | defendant's release in the particular case.  In order |
|  | 9 | for a defendant to be detained, the Court must |
| 12:07:02:06 | 10 | identify an articulable threat posed by the defendant |
|  | 11 | to an individual or to the community.  And that really |
|  | 12 | goes to the heart of the determination that the Court |
|  | 13 | must make. |
|  | 14 | In these cases generally, and in this |
| 12:07:14:10 | 15 | case specifically, it appears that there are several |
|  | 16 | potential dangers that could be posed by the |
|  | 17 | defendant's release, some of which were specifically |
|  | 18 | articulated, some of which were alluded to in the |
|  | 19 | questioning of witnesses in the case. |
| 12:07:30:07 | 20 | Certainly one issue relates to the danger |
|  | 21 | that the individual defendant could pose to the |
|  | 22 | alleged specific victim in this particular case. |
|  | 23 | While there was testimony regarding violations of the |
|  | 24 | juvenile court order regarding contact with the |
| 12:07:52:04 | 25 | defendant, there's no evidence that I have before me |

12:07:55:24    1    in this year and a half that, roughly almost, that

2    this matter has been pending that the alleged victim

3    has been harmed in any way of a physical nature or of

4    a nature similar to what's alleged in the indictment

12:08:11:28    5    in this case by the defendant notwithstanding those

6    allegations of violating the Court's order.

7              It appears that the alleged violation of

8    the juvenile court orders relate really to two issues:

9    One that the defendant may attempt to tamper with or

12:08:30:05   10    interfere with witness testimony or otherwise

11    influence that testimony; and No. 2, as it relates, as

12    Ms. Morrison points out, to the Court's confidence in

13    the defendant's ability to comply with conditions of

14    release in this particular case.

12:08:44:18   15              But as far as actual danger to the

16    alleged victim in this case, notwithstanding those two

17    issues, I just haven't been presented with any

18    evidence that those contacts or anything else has

19    resulted in ongoing continuing danger to this victim.

12:09:02:18   20              A second area of danger that the Court

21    would have to be concerned about in a case like this

22    would be that the defendant could engage in similar

23    conduct as to other individuals who were similarly

24    vulnerable.  The Court notes initially that to the

12:09:18:09   25    extent that these allegations relate to a family

12:09:22:03    1    member, the Court's heard the evidence that pretty

2    much immediately in January of 2021 these children

3    have been removed from the defendant and she has no

4    interaction with them other than that which is

12:09:37:16    5    authorized by the juvenile court orders. And,

6    therefore, they don't -- it doesn't appear that there

7    is an immediate risk of harm to them of a similar

8    nature to what's alleged in the indictment in this

9    particular case.

12:09:49:19    10    Likewise, as it relates to other

11    potential victims, the Court heard the testimony with

12    regard to access or availability to other minor

13    children, and, again, you know, we've got now almost a

14    year and a half of experience where those

12:10:09:24    15    circumstances could have existed. There's no evidence

16    that I've been presented with that there are any other

17    potential victims or any other concern or harm that's

18    come to any other potential victims during that period

19    of time. So that danger is one that seems to me that

12:10:25:19    20    can be addressed and is mitigated.

21    A third danger in cases like this involve

22    the possibility that an individual will continue to

23    receive child pornography or distribute child

24    pornography or otherwise use the Internet in order to

12:10:42:22    25    engage -- or any other source, I guess, in order to

12:10:45:16　　1　engage in similar conduct related to pornographic

　　　　　　　2　material.

　　　　　　　3　　　　　　And, again, the Court has to give

　　　　　　　4　significant weight to the fact that the defendant in

12:10:56:14　　5　this case has been at liberty since January of 2021

　　　　　　　6　when these allegations were known and has had no type

　　　　　　　7　of restriction on that access.  Yet when I asked the

　　　　　　　8　investigator specifically, there's been no evidence

　　　　　　　9　that's been developed and certainly none presented to

12:11:17:25　　10　this Court regarding Counts One and Two of the

　　　　　　　11　indictment since June of 2021.

　　　　　　　12　　　　　　So, again, we have a significant period

　　　　　　　13　of time where Ms. Johnson has not been subject to

　　　　　　　14　those restrictions and yet there's no evidence of any

12:11:34:18　　15　ongoing danger that exists in the community or to the

　　　　　　　16　community or any individuals within the community.

　　　　　　　17　　　　　　The Court has considered all of this

　　　　　　　18　evidence, and I believe that it's all significant.

　　　　　　　19　It's significant as it relates to the potential danger

12:19:11:01　　20　that -- the dangers that I can potentially identify as

　　　　　　　21　I have to do and that have been provided and presented

　　　　　　　22　to me by the government through its proof in this case

　　　　　　　23　are dangers that, it appear to me, can be mitigated

　　　　　　　24　against and can be addressed through conditions of

12:19:28:07　　25　release.

| | | |
|---|---|---|
| 12:19:30:18 | 1 | I do, however, have concerns that I've |
| | 2 | heard evidence that's not been really refuted or |
| | 3 | disputed about alleged violations of the juvenile |
| | 4 | court order with regard to contact with the -- with |
| 12:19:51:03 | 5 | the child in this particular case. And I do have |
| | 6 | concerns that that would -- that, you know, that has |
| | 7 | to enter into the equation in terms of my confidence |
| | 8 | that the defendant could comply with conditions of |
| | 9 | release that might be imposed. |
| 12:20:08:22 | 10 | Having considered all of that, I do find |
| | 11 | that there are conditions of release that will |
| | 12 | reasonably assure the safety of the community in this |
| | 13 | particular matter. I do believe that those conditions |
| | 14 | would be more onerous but for -- or are more onerous |
| 12:20:29:27 | 15 | than they would be but for the allegations that |
| | 16 | Ms. Johnson has violated certain of the conditions and |
| | 17 | orders of the juvenile court. |
| | 18 | There's no evidence before me about why |
| | 19 | the juvenile court's handled matters the way they have |
| 12:20:45:26 | 20 | or why they've done or not done what they've done, but |
| | 21 | certainly the evidence before me is that |
| | 22 | notwithstanding these alleged violations of that |
| | 23 | Court's orders, it's continued to allow her to have |
| | 24 | contact with these children and I think that that's |
| 12:20:59:02 | 25 | entitled to some significant weight on my part. |

12:21:03:07    1    However, to be clear, I think that compliance with the

2    juvenile court orders will be an integral and

3    important part of my release order in this case. And

4    in the event that there are future violations of the

12:21:15:10    5    juvenile court orders, then not only will the juvenile

6    court decide to do whatever they want to do with it,

7    but this Court will take that very, very seriously and

8    address those issues moving forward.

9           So in light of all of that, the Court

12:21:30:02    10    will order that Ms. Johnson be released subject to the

11    following conditions: It will be the order of the

12    Court that Ms. Johnson be released; that she must not

13    violate any federal, state or law while on release.

14    She must advise the Court or Pretrial Services in

12:21:43:14    15    writing before making any changes of residence or

16    telephone number. She must appear in court as

17    required and, if convicted, must surrender as directed

18    to serve any sentence that might be imposed.

19           I am going to order that she be placed in

12:21:55:04    20    the custody of Ms. Biane McGee and I will order that

21    she reside at Ms. McGee's residence. We're not going

22    to stay at the condo. And the only people who are

23    going to be living there are Ms. McGee, her husband

24    and the defendant in this particular case.

12:22:14:02    25           She will be ordered to submit to

| | | |
|---|---|---|
| 12:22:16:08 | 1 | supervision by and report for supervision to the |
| | 2 | Pretrial Services Office as directed.  She is to |
| | 3 | surrender any passport to the United States Probation |
| | 4 | Office.  And she is not to obtain a passport or other |
| 12:22:33:01 | 5 | international travel document. |
| | 6 | She's to abide by the following |
| | 7 | restrictions on personal association, residence and |
| | 8 | travel, which will be limited to the Middle and |
| | 9 | Eastern Districts of Tennessee unless preapproved by |
| 12:22:44:06 | 10 | Pretrial Services.  She's to avoid all contact, |
| | 11 | directly or indirectly, with any person who may be a |
| | 12 | witness or victim in the investigation or prosecution |
| | 13 | of this matter, except as authorized by the juvenile |
| | 14 | court orders in this case. |
| 12:22:56:25 | 15 | She is to obtain medical or psychiatric |
| | 16 | treatment as directed by the Pretrial Services if |
| | 17 | deemed appropriate.  She's not to possess a firearm, |
| | 18 | destructive device or other dangerous weapon.  She's |
| | 19 | not to use alcohol excessively.  She's not to use or |
| 12:23:10:01 | 20 | unlawfully possess a narcotic drug or other controlled |
| | 21 | substance defined by the law unless prescribed by a |
| | 22 | licensed medical practitioner. |
| | 23 | She's to submit to testing for prohibited |
| | 24 | substance if required by the Pretrial Services office |
| 12:23:22:06 | 25 | or supervising officer.  That testing may be used with |

| | | |
|---|---|---|
| 12:23:23:24 | 1 | random frequency and may include urine testing, the |
| | 2 | swearing of a sweat patch, remote alcohol testing |
| | 3 | system and/or any other form of prohibited substance |
| | 4 | screening or testing and the defendant must not |
| 12:23:34:00 | 5 | obstruct, attempt to obstruct or tamper with the |
| | 6 | efficiency and accuracy of prohibited substance |
| | 7 | screening or testing. |
| | 8 | She's to participate in a program of |
| | 9 | inpatient or outpatient substance abuse therapy and |
| 12:23:43:27 | 10 | counseling if directed by Pretrial Services and she's |
| | 11 | to participate in the following location restriction |
| | 12 | program and comply with its requirements as directed. |
| | 13 | I'm going to order that the defendant |
| | 14 | participate in the program of home incarceration, |
| 12:23:57:04 | 15 | meaning that you'll be restricted to 24-hour-a-day |
| | 16 | lockdown at the residence except for medical |
| | 17 | necessities and court appearances or other activities |
| | 18 | specifically approved by the Court, and this will |
| | 19 | include meetings with counsel and also as authorized |
| 12:24:11:29 | 20 | by juvenile court orders in the underlying case. |
| | 21 | You're to submit to location monitoring |
| | 22 | as directed by Pretrial Services and comply with all |
| | 23 | of the program requirements, and you must pay for all |
| | 24 | or part of the cost of the program based on ability to |
| 12:24:26:11 | 25 | pay as determined by Pretrial Services. You're to |

| | |
|---|---|
| 12:24:28:29 | 1 |

report as soon as possible, within 48 hours to the

Pretrial Services Office or supervising officer every

contact with a law enforcement personnel, including

arrest, questioning or traffic stops.

5        You're to permit Pretrial Services to

visit you at home or elsewhere at any time and allow

the officer to confiscate any contraband in plain

view.  You're not to possess or access any device with

Internet access, except as authorized by any juvenile

court orders.  This means that at the McGee residence

I will allow the McGees to utilize their electronic

devices and Internet service that is password

protected as testified to by Ms. McGee; however, the

defendant will not be allowed to have access to the

Internet or any devices that have Internet access to

them.

I need to also advise you of the

following penalties and sanctions:  Violating any of

the foregoing conditions of release may result in the

immediate issuance of a warrant for your arrest or

revocation of your release, an order of detention and

a prosecution for contempt of court and could result

in imprisonment, a fine or both.  While on release if

you commit a federal felony offense, the punishment is

an additional prison term of not more than ten years,

| | | |
|---|---|---|
| 12:25:39:17 | 1 | and for federal misdemeanor offense, the punishment is |
| | 2 | an additional prison term of not more than one year. |
| | 3 | This sentence will be consecutive, meaning in |
| | 4 | addition, to any other sentence you receive. |
| 12:25:47:25 | 5 | It's a crime punishable by up to ten |
| | 6 | years in prison, a $250,000 fine or both to obstruct a |
| | 7 | criminal investigation, tamper with a witness, victim |
| | 8 | or informant, retaliate or attempt to retaliate |
| | 9 | against a witness, victim or informant or intimidate |
| 12:25:58:15 | 10 | or attempt to intimidate a witness, victim, juror, |
| | 11 | informant or officer of the Court. The penalties for |
| | 12 | tampering, retaliation or intimidation are |
| | 13 | significantly more serious if they involve a killing |
| | 14 | or attempted killing. |
| 12:26:08:05 | 15 | If after release you knowingly fail to |
| | 16 | appear as the conditions of release require or to |
| | 17 | surrender to serve a sentence, you may be prosecuted |
| | 18 | for failure to appear or surrender and an additional |
| | 19 | punishment may be imposed. If you're convicted of an |
| 12:26:18:06 | 20 | offense punishable by a term of imprisonment of life |
| | 21 | or imprisonment for a term of 15 years or more, you |
| | 22 | can be fined not more than $250,000, imprisoned for |
| | 23 | not more than ten years or both. For a misdemeanor, |
| | 24 | you'd be fined not more than $100,000, imprisoned for |
| 12:26:31:19 | 25 | not more than two years or both, and any term of |

12:26:34:25  1   imprisonment imposed for failure to appear or

2   surrender would be consecutive to any other sentence

3   you receive.

4           Now, I need to ask Ms. McGee some

12:26:43:24  5   questions.  Is she still there, Mr. Evans?

6           MR. EVANS:  She is, Your Honor.

7           THE COURT:  All right.

8           MR. EVANS:  I'll move the camera over to

9   her.

12:26:52:11  10          THE COURT:  All right.  Ms. McGee, did

11  you hear the conditions of release that I just

12  reviewed with Ms. Johnson?

13          MS. McGEE:  Yes, I did.

14          THE COURT:  All right.  And based upon

12:27:00:28  15  those conditions, namely the condition that wasn't

16  discussed at the hearing, which is I'm going to order

17  her to stay at your house 24/7, that means no -- she's

18  not going to be working, she's not going to be leaving

19  except for specifically approved activities, do you

12:27:18:02  20  still agree to supervise the defendant in this case?

21          MS. McGEE:  Yes, I do.

22          THE COURT:  And will you use every effort

23  to assure the defendant's appearance at all court

24  proceedings?

12:27:29:05  25          MS. McGEE:  Yes, I will.

|            |    |                                                          |
|------------|----|----------------------------------------------------------|
| 12:27:30:00 | 1  | THE COURT:  And notify the Court |
|            | 2  | immediately if she violates the condition of release |
|            | 3  | or is no longer in your custody? |
|            | 4  | MS. McGEE:  Yes, I will. |
| 12:27:36:24 | 5  | THE COURT:  And you understand that among |
|            | 6  | those conditions will be that she is not to be able to |
|            | 7  | access the Internet at your residence or not to have |
|            | 8  | any devices that allow her to access the Internet.  Do |
|            | 9  | you understand that? |
| 12:27:47:12 | 10 | MS. McGEE:  Yes, I do. |
|            | 11 | THE COURT:  And is that going to present |
|            | 12 | you with any problems in terms of your obligation as |
|            | 13 | the third-party custodian? |
|            | 14 | MS. McGEE:  No, it's not. |
| 12:27:54:23 | 15 | THE COURT:  All right.  Very good. |
|            | 16 | All right.  Ms. Johnson, I need to ask |
|            | 17 | you some questions now.  Do you acknowledge that |
|            | 18 | you're the defendant in this case and that you're |
|            | 19 | aware of the conditions of release that I just |
| 12:28:11:24 | 20 | reviewed with you, ma'am? |
|            | 21 | THE DEFENDANT:  Yes, Your Honor. |
|            | 22 | THE COURT:  And do you promise to obey |
|            | 23 | all the conditions of release, to appear as directed |
|            | 24 | and surrender to serve any sentence that may be |
| 12:28:21:07 | 25 | imposed? |

| | | |
|---|---|---|
| 12:28:21:22 | 1 | THE DEFENDANT:  Yes, Your Honor. |
| | 2 | THE COURT:  And that you're aware of the |
| | 3 | penalties and sanctions set forth in the document that |
| | 4 | I just reviewed? |
| 12:28:27:08 | 5 | THE DEFENDANT:  Yes, Your Honor. |
| | 6 | THE COURT:  All right.  This will be the |
| | 7 | order of the Court.  And you'll be released following |
| | 8 | any processing required by the marshals and subject to |
| | 9 | these conditions. |
| 12:28:41:10 | 10 | Upon your release you'll need to go to |
| | 11 | the probation office and meet with Pretrial Services |
| | 12 | for them to take care of the electronic monitoring and |
| | 13 | also to provide you with a copy of this order and |
| | 14 | review those conditions with you. |
| 12:28:55:29 | 15 | I want to be very clear, Ms. Johnson, |
| | 16 | with you, that my expectation is that you will comply |
| | 17 | with each and every one of these conditions.  They are |
| | 18 | all important and you need to comply with all of them. |
| | 19 | It will also be my expectation that you comply with |
| 12:29:11:20 | 20 | each and every one of the conditions that are in |
| | 21 | effect by the juvenile court up in Knoxville.  And if |
| | 22 | I find out that you violated any of those conditions |
| | 23 | or any information is brought to me, then you'll have |
| | 24 | to answer for that.  And that will be the order of the |
| 12:29:28:03 | 25 | Court. |

12:29:30:17   1            Ms. Morrison, is there anything further
          2       from the government's standpoint to do today?
          3            MS. MORRISON:  Yes, Your Honor.  At this
          4       time I'd make an oral motion that the Court stay its
12:29:39:09   5       release order.  It's my understanding that the
          6       US Attorney's Office for the Eastern District of
          7       Tennessee intends to appeal to the District Court
          8       judge there, so I'd ask the Court to stay its order
          9       temporarily.
12:29:51:03  10            THE COURT:  Do you have a specific
         11       request for a time period?
         12            MS. MORRISON:  Your Honor, if the
         13       Court -- okay, so today is Wednesday.  If Court would
         14       stay its release order until at least Friday to give
12:30:00:07  15       us time to get the appeal filed and hopefully set a
         16       hearing date.
         17            THE COURT:  Mr. Evans?
         18            MR. EVANS:  Your Honor, we would
         19       absolutely object to staying this order.  At this
12:30:12:05  20       point in time Your Honor has heard the proof and has
         21       ruled.  There's -- the government has put forth no
         22       proof whatsoever of any immediate risk for harm that
         23       she'd pose.  Considering all of the information
         24       Your Honor's heard about my client's engagement in
12:30:30:15  25       this case and the government's failure to act on their

| | | |
|---|---|---|
| 12:30:36:06 | 1 | perceived threat of harm any sooner than this, I -- I |
| | 2 | don't understand why they would want to keep her in |
| | 3 | custody for several more days when she's given no |
| | 4 | indication that she's going to -- that she's a risk of |
| 12:30:50:08 | 5 | flight or a danger to the community, especially in |
| | 6 | light of these conditions. |
| | 7 | She will be under electronic monitoring, |
| | 8 | she won't leave that courthouse without that |
| | 9 | electronic monitoring, and she will not have access to |
| 12:31:03:08 | 10 | any Internet capability devices during that period of |
| | 11 | time. |
| | 12 | So, therefore, Your Honor, there's no |
| | 13 | justification for staying this order.  They still have |
| | 14 | the ability to appeal without the stay, and she's |
| 12:31:15:26 | 15 | given every indication that she will actively engage |
| | 16 | and respond to that appeal in the Eastern District and |
| | 17 | engage in that case. |
| | 18 | THE COURT:  Okay.  I'll stay the order |
| | 19 | until 1 o'clock Central time tomorrow.  We'll have |
| 12:31:32:07 | 20 | Ms. Johnson brought back to the courthouse tomorrow if |
| | 21 | she is -- if there's no further action by the District |
| | 22 | Court in the Eastern District by that time, she'll be |
| | 23 | released from here.  Otherwise that should be adequate |
| | 24 | time for the government to do whatever it needs to do. |
| 12:31:49:05 | 25 | And that's what we'll do with this. |

12:31:51:26    1               MS. MORRISON:  Thank you, Your Honor.

               2               THE COURT:  All right.  Thank you all

               3     very much.  Appreciate everyone participating by video

               4     conference today.  We'll be in recess.  Good luck to

12:31:58:19    5     you, Ms. Johnson.  Hope everything works out for you

               6     okay.

               7               MR. EVANS:  Thank you, Your Honor.

               8               **\*\*\*END OF ELECTRONIC RECORDING\*\*\***

               9

              10

              11

              12

              13

              14

              15

              16

              17

              18

              19

              20

              21

              22

              23

              24

              25

12:32:02:12  1    # REPORTER'S CERTIFICATE

2

3              I, Roxann Harkins, Official Court Reporter

4     for the United States District Court for the Middle

12:32:02:12  5    District of Tennessee, in Nashville, do hereby

6     certify:

7              That I transcribed from **electronic**

8     **recording** the proceedings held via video conference on

9     April 20, 2022, in the matter of UNITED STATES OF

12:32:02:12  10   AMERICA v. JUSTIS JOHNSON, Case No. 3:22-mj-4149 ;

11             that said proceedings in connection with the

12    hearing were reduced to typewritten form by me; and

13    that the foregoing transcript is a true and accurate

14    transcript of said proceedings.

12:32:02:12  15

16             This is the 17th day of June, 2022.

17

18                       s/ Roxann Harkins____
                         ROXANN HARKINS, RPR, CRR
19                       Official Court Reporter

12:32:02:12  20

21

22

23

24

25